## COMMONWEALTH *vs.* ARTHUR MANCHESTER.

Barnstable.    March 31, 1890. — September 18, 1890.

Present: FIELD, C. J., DEVENS, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*High Seas — Tide Waters — Menhaden Fishery — Jurisdiction of State — Bays — Constitutional Law.*

The territorial jurisdiction of a nation over the adjacent seas, subject to the common right of navigation, extends by the law of nations to the distance of one marine league at least from the shore, and to bays wholly within the territory of the nation, which do not exceed in width two marine leagues at the mouth; and within this jurisdiction is the right of control over fisheries in such waters, whether the fish are migratory and free-swimming, or free-moving, or attached to or imbedded in the soil.

The St. of 1886, c. 192, regulating the taking of fish with nets and seines in Buzzard's Bay, a bay less than two marine leagues in width at its mouth, and wholly

within the territorial limits and jurisdiction of this State, is not repugnant to the Federal Constitution, and, in the absence of any treaty or legislation by the United States on the subject, is binding upon citizens of other States, and on fishing vessels enrolled and licensed under the laws of the United States.

The St. of 1865, c. 212, so far as it relates to the taking of menhaden by the use of the purse seine in the waters of Buzzard's Bay, is repealed by implication by the St. of 1886, c. 192.

COMPLAINT, on the St. of 1886, c. 192, § 1, charging that the defendant, while commorant of Falmouth in the county of Barnstable, at Falmouth, on July 19, 1889, "did then and there draw, set, stretch, and use a purse seine for the taking of fish in the waters of Buzzard's Bay, within the jurisdiction of this Commonwealth."

Trial in the Superior Court, before *Sherman*, J., who, after a verdict of guilty, reported the case for the determination of this court, in substance as follows.

The evidence introduced by the government tended to show that the defendant and others, who were citizens of Rhode Island, and were officers and crew of the fishing steamer A. T. Serrell, on the day alleged, were engaged in drawing, setting, stretching, and using a purse seine for the taking of fish in the waters of Buzzard's Bay; that the place where the defendant and the others were so engaged was about, and not exceeding, one mile and a quarter from a point on the shore midway from the north line of the town of Falmouth to the south line thereof; that the point where they were so using said seine was within that part of Buzzard's Bay which the Harbor and Land Commissioners, acting under the provisions of section 2 of chapter 196 of the Acts of the year 1881, had, so far as they were capable of doing so, assigned to and made a part of the town of Falmouth; that the defendant and his associates, on that day and at that place, caught with a seine a large quantity of the fish called menhaden; that in so doing no fixed apparatus was used, and the bottom of the sea was not encroached upon or disturbed; that the distance between the headlands at the mouth of Buzzard's Bay, viz. at Westport in the county of Bristol on the one side, and the island of Cuttyhunk, the most southerly of the chain of islands lying to the eastward of Buzzard's Bay, and known as the Elizabeth Islands, in the county of Dukes County, on the other side, was more than one and less than two

marine leagues; and that the distance across said bay at the point where the acts of the defendant were done is more than two marine leagues, and the opposite points are in different counties.

The defendant did not dispute any of the evidence offered by the government, but introduced evidence tending to show that it was impossible to discern objects across from one headland to the other at the mouth of Buzzard's Bay; that the steamer was of Newport, Rhode Island, duly enrolled and licensed at that port under the laws of the United States for carrying on the menhaden fishery; that he was in the employ of a firm engaged in the State of Rhode Island in the business of seining menhaden to be sold for bait, and to be manufactured into fish oil and fertilizer; that he was engaged in fishing for menhaden only, and caught no other fish; that menhaden is not a food fish, and is only valuable for the purpose of bait and the manufacture of fish oil and fertilizer; and that the taking of menhaden by seining does not tend in any way to decrease the quantity and variety of food fishes.

It was conceded by the government that the defendant was employed upon the vessel described by the enrolment and license, and at the time of the commission of the acts complained of he and his associates were so in the employ of the vessel described in the license; and that the defendant could not be convicted if the St. of 1865, c. 212, was not repealed by the St. of 1886, c. 192.

The defendant asked the judge to rule, that, notwithstanding the St. of 1886, c. 192, he was authorized to take menhaden by the use of the purse seine in the waters of Buzzard's Bay in the place where this act was committed; that that statute did not repeal the St. of 1865, c. 212; that the defendant might lawfully take menhaden by the use of the purse seine in Buzzard's Bay, in the place where the acts complained of were done; that the act complained of was on the high seas and without the jurisdiction of Massachusetts, and having been done under a United States license for carrying on this fishery, the defendant could not be held as a criminal for violating a statute of this Commonwealth; that the defendant could not be held unless the act complained of was done and committed within the body of a

county as understood at common law; that the statute of this Commonwealth prohibiting under a penalty the use of nets and seines and the taking of fish within three miles of the shore was invalid, especially as against a license to fish granted under the laws of the United States; and that on all the evidence the defendant could not be convicted.

The judge declined so to rule, and instructed the jury that the St. of 1865, c. 212, was repealed by the St. of 1886, c. 192; that if they found that the defendant was engaged in using a purse seine for the taking of fish of any kind in that part of Buzzard's Bay which was within the jurisdiction of the Commonwealth of Massachusetts, they would be authorized to convict the defendant; and that the place where the acts of the defendant were committed, being within a marine league from the shore at low-water mark, was within the jurisdiction of the Commonwealth.

*G. A. King & J. F. Jackson*, for the defendant.

*H. C. Bliss*, First Assistant Attorney General, for the Commonwealth.

FIELD, C. J.    The defendant was complained of for taking fish by the use of a purse seine in the waters of Buzzard's Bay, within the jurisdiction of this Commonwealth.    It appears by the report, that the point in Buzzard's Bay where the seine was used " was within that part of Buzzard's Bay which the Harbor and Land Commissioners, acting under the provisions of section 2 of chapter 196 of the Acts of the year 1881, had, so far as they were capable of doing so, assigned to and made a part of the town of Falmouth"; that the distance between the headlands at the mouth of Buzzard's Bay is " more than one and less than two marine leagues"; and that " the distance across said bay at the point where the acts of the defendant were done is more than two marine leagues, and the opposite points are in different counties."    The place " was about, and not exceeding, one mile and a quarter from a point on the shore midway from the north line of the town of Falmouth to the south line" of said town. Buzzard's Bay lies wholly within the territory of Massachusetts, having Barnstable County on the one side, and the counties of Bristol and Plymouth on the other.    The defendant offered evidence that he was fishing for menhaden only, with a purse seine, and that the bottom of the sea " was not encroached upon or dis-

turbed "; and that " it was impossible to discern objects across from one headland to the other at the mouth of Buzzard's Bay "; that he was a citizen of the State of Rhode Island, and that the vessel upon which he was employed, and in connection with which he was using the seine, belonged to Newport, in that State, and had been " duly enrolled and licensed at that port under the laws of the United States for carrying on the menhaden fishery."

It was contended at the trial, among other things, that the St. of 1886, c. 192, under which the complaint was made, had not repealed the St. of 1865, c. 212; but this has not been argued in this court. It is plain that the St. of 1886, c. 192, was intended to regulate the whole subject of using nets or seines for taking fish in the waters of Buzzard's Bay, and that by implication it repealed the St. of 1865, c. 212, so far as that statute related to the taking of menhaden by the use of a purse seine in the waters of that bay. The principal question argued here is, whether the place where the acts of the defendant were done was within the jurisdiction of the Commonwealth of Massachusetts.

The Pub. Sts. c. 1, §§ 1, 2, are as follows: " Section 1. The territorial limits of this Commonwealth extend one marine league from its sea-shore at low-water mark. When an inlet or arm of the sea does not exceed two marine leagues in width between its headlands, a straight line from one headland to the other is equivalent to the shore line. Section 2. The sovereignty and jurisdiction of the Commonwealth extend to all places within the boundaries thereof; subject to the rights of concurrent jurisdiction granted over places ceded to the United States." The Pub. Sts. c. 22, § 1, contain the following provision: " The boundaries of counties bordering on the sea shall extend to the line of the Commonwealth, as defined in section one of chapter one." Section 11 of the same chapter is as follows: " The jurisdiction of counties separated by waters within the jurisdiction of the Commonwealth shall be concurrent upon and over such waters." The St. of 1881, c. 196, which has been referred to, is as follows: " Section 1. The boundaries of cities and towns bordering upon the sea shall extend to the line of the Commonwealth, as the same is defined in section one of chapter

one of the General Statutes. Section 2. The Harbor and Land Commissioners shall locate and define the courses of the boundary lines between adjacent cities and towns bordering upon the sea, and upon arms of the sea, from high-water mark outward to the line of the Commonwealth, as defined in said section one, so that the same shall conform as nearly as may be to the course of the boundary lines between said adjacent cities and towns on the land; and they shall file a report of their doings, with suitable plans and exhibits, showing the boundary lines of any town by them located and defined, in the registry of deeds in which deeds of real estate situated in such town are required to be recorded, and also in the office of the Secretary of the Commonwealth." Sections 1 and 2 of chapter 1 of the General Statutes contain the provisions which have been before recited, as now contained in the Pub. Sts. c. 1, §§ 1, 2, and c. 22, §§ 1, 11. These provisions were first enacted by the St. of 1859, c. 289. Section 1 of the Rev. Sts. c. 1, was as follows: "The sovereignty and jurisdiction of the Commonwealth extend to all places within the boundaries thereof; subject only to such rights of concurrent jurisdiction as have been or may be granted over any places ceded by the Commonwealth to the United States." The boundaries of the Commonwealth on the sea were first exactly defined by the St. of 1859, c. 289. The boundaries of the territory granted by the charter of the Colony of New Plymouth, or of the territory included in the Province Charter, need not be particularly set forth. Buzzard's Bay was undoubtedly within the territory described in those charters.

By the definitive treaty of peace between the United States of America and Great Britain, "His Britannic Majesty acknowledges the said United States, viz. New Hampshire, Massachusetts Bay, . . . to be free, sovereign, and independent States; that he treats with them as such; and for himself, his heirs and successors, relinquishes all claims to the government, propriety, and territorial rights of the same, and every part thereof." 8 U. S. Sts. at Large, 81. If Massachusetts had become an independent nation, there can be no doubt, we think, that her boundaries on the sea, as she has defined them by the statutes, would be acknowledged by all foreign nations, and that her right to control the fisheries within these boundaries would be

conceded. It has often been a matter of controversy how far a nation has a right to control the fisheries on its sea-coast, and in the bays and arms of the sea within its territory; but the limits of this right have never been placed at less than a marine league from the coast on the open sea; and bays wholly within the territory of a nation, the headlands of which are not more than six geographical miles apart, have always been regarded as a part of the territory of the nation in which they lie. More extensive rights in these respects have been and are now claimed by some nations; but, so far as we are aware, all nations concede to each other the right to control the fisheries within a marine league of the coast, and in bays within the territory the headlands of which are not more than two marine leagues apart.

In the proceedings of the Halifax Commission, under the Treaty of Washington of May 8, 1871, where it was for the interests of the United States to claim against Great Britain, independently of treaties, as extensive rights of fishing as could be maintained, the claim was stated, in the answer on behalf of the United States, as follows: "It becomes necessary at the outset to inquire what rights American fishermen, and those of other nations, possess, independently of treaty, upon the ground that the sea is the common property of all mankind. For the purposes of fishing, the territorial waters of every country along the sea-coast extend three miles from low-water mark; and beyond is the open ocean, free to all. In the case of bays and gulfs, such only are territorial waters as do not exceed six miles in width at the mouth upon a straight line measured from headland to headland. All larger bodies of water connected with the open sea form a part of it. And whenever the mouth of a bay, gulf, or inlet exceeds the maximum width of six miles at its mouth, and so loses the character of territorial or inland waters, the jurisdictional or proprietary line for the purpose of excluding foreigners from fishing is measured along the shore of the bay according to its sinuosities, and the limit of exclusion is three miles from low-water mark." Documents and Proceedings of the Halifax Commission, (Washington, 1878,) Vol. I. p. 120 (45th Cong. 2d Sess., H. R. Ex. Doc., No. 89). The government of Canada had been instructed by the government of Great

Britain, on April 12, 1866, "that American fishermen should not be interfered with, either by notice or otherwise, unless found within three miles of the shore, or within three miles of a line drawn across the mouth of a bay or creek which is less than ten geographical miles in width, in conformity with the arrangement made with France in 1839 "; but afterwards the British government issued instructions " that the United States fishermen will not be for the present prevented from fishing, except within three miles of land, or in bays which are less than six miles broad at the mouth." Vol. I. pp. 120, 121.   It is true that Mr. Dana, of counsel for the United States, contended, in argument with reference to the right to fish in the open sea, " that the deep-sea fisherman, pursuing the free-swimming fish of the ocean with his net or his leaded line, not touching shores or troubling the bottom of the sea, is no trespasser, though he approach within three miles of a coast, by any established recognized law of all nations." Vol. II. p. 1654.   This contention, however, did not touch the right to fish in bays or arms of the sea, and it was not the claim actually made by the United States before the Commission.   This is stated in the answer and in the brief of the United States.   The answer does not allude to any such position as that taken by Mr. Dana in his closing argument, but in the brief it is said : " Many authorities maintain that whenever, under the law of nations, any part of the sea is free for navigation, it is likewise free for fishing by those who sail over its surface.   But, without insisting upon this position, the inevitable conclusion is, that prior to the Treaty of Washington the fishermen of the United States, as well as those of all other nations, could rightfully fish in the open sea more than three miles from the coast, and could also fish at the same distance from the shore in all bays more than six miles in width, measured in a straight line from headland to headland." Vol. I. p. 166.

The counsel for the defendant in the case at bar place much reliance upon the decision in *The Queen* v. *Keyn,* 2 Ex. D. 63. In that case, the defendant was the officer in command of the Franconia, a German steamer, which, at a point " one mile and nine tenths of a mile S. S. E. from Dover pier-head, and within two and a half miles from Dover beach," in the English

Channel, ran down and sank the British steamer Strathclyde, and one of the Strathclyde's passengers was drowned. The defendant was indicted in the Central Criminal Court for manslaughter. The question was whether the offence was committed within the jurisdiction of the admiralty, the Central Criminal Court having jurisdiction to hear and determine any offence alleged " to have been committed on the high seas or other places within the jurisdiction of the Admiralty of England." (p. 100.) A majority of the court held that the offence was committed on the German steamer, and not on the British steamer; and that, under the laws then existing, there was no admiralty jurisdiction over an offence committed by a foreigner on a foreign ship on the open sea, whether within or without a marine league from the shore of England. In consequence of this decision, Parliament passed the St. of 41 and 42 Vict. c. 73. By that act it was declared that, " for the purpose of any offence declared by this act to be within the jurisdiction of the Admiral, any part of the open sea within one marine league of the coast measured from low-water mark shall be deemed to be open sea within the territorial waters of Her Majesty's dominions."

It is obvious that by this decision the court did not attempt to define the extent of the dominion of Great Britain over the open sea adjacent to the coast, but only the extent of the existing admiralty jurisdiction over offences committed on the open sea. The courts of England would undoubtedly enforce any act of Parliament conferring upon them jurisdiction over offences committed anywhere. It is equally obvious that the decision has nothing to do with the right of control over fisheries in the open sea, or in bays or arms of the sea. The case contains a great deal of learning upon the respective limits of the common law jurisdiction and of the admiralty jurisdiction in England over crimes, and upon the boundaries of counties in England under the laws then existing. These distinctions are immaterial in the case at bar, except with reference to the contention that the place where the acts complained of were done was within the admiralty jurisdiction of the courts of the United States. The boundaries of counties in Massachusetts may be defined by statute, and they may be made to extend over all the territory of Massachusetts, whether it be sea or land; and, if Massachusetts has a

right to control the fisheries in Buzzard's Bay, offences in viola-
tion of the regulations which the State may establish can be tried
in any of its courts upon which it may confer jurisdiction.    It is
to be noticed, however, that in all the citations contained in the
different opinions given in *The Queen* v. *Keyn,* wherever the ques-
tion of the right of fishery is referred to, it is conceded that the
control to the extent at least of a marine league belongs to the
nation on whose coast the fisheries are.    The argument of Mr.
Benjamin, of counsel for the defendant, is not contained in the
report of the case; but from the statement of Mr. Justice Lind-
ley, found on page 90 of the report, it seems that he admitted
that the dominion of a State over the seas adjoining its shore
existed for the purpose of protecting " its coasts from the effects
of hostilities between other nations which may be at war, the
protection of its revenue and of its fisheries, and the preservation
of order by its police."

In *Direct United States Cable Co.* v. *Anglo-American Telegraph
Co.* 2 App. Cas. 394, it became necessary for the Privy Council
to determine whether a point in Conception Bay, Newfoundland,
more than three miles from the shore, was a part of the territory
of Newfoundland, and within the jurisdiction of its legislature.
It appeared that the average width of the bay " is about fifteen
miles," and the distance between the headlands is " rather more
than twenty miles."    Lord Blackburn, in delivering the opinion
says, at page 416: " The question raised in this case, and to
which their Lordships confine their judgment, is as to the terri-
torial dominion over a bay of configuration and dimensions such
as those of Conception Bay above described.    The few English
common law authorities on this point relate to the question as
to where the boundary of counties ends, and the exclusive juris-
diction at common law of the Court of Admiralty begins, which
is not precisely the same question as that under consideration;
but this much is obvious, that when it is decided that any bay
or estuary of any particular dimensions is or may be a part of
an English county, and so completely within the realm of Eng-
land, it is decided that a similar bay or estuary is or may be part
of the territorial dominions of the country possessing the adja-
cent shore."    He quotes, at page 417, the well known language
of Lord Hale: " That arm or branch of the sea which lies within

the *fauces terræ,* where a man may reasonably discerne between shore, is, or at least may be, within the body of a county, and therefore within the jurisdiction of the sheriff or coroner," and comments upon its indefiniteness; and then cites the case of *Regina* v. *Cunningham,* Bell C. C. 72, 86, and says, at page 419, that in this case " this much was determined, that a place in the sea, out of any river, and where the sea was more than ten miles wide, was within the county of Glamorgan, and consequently, in every sense of the words within the territory of Great Britain." Apparently he was of opinion that, by most of the text-writers on international law, Conception Bay would be excluded from the territory of Newfoundland, and the part of the Bristol Chan̄nel which in *Regina* v. *Cunningham* was decided to be in the county of Glamorgan would be excluded from the territory of Great Britain; but he decides that Conception Bay is a part of the territory of Newfoundland, because the British government has exercised exclusive dominion over it, with the acquiescence of other nations, and it has been declared by act of Parliament " to be part of the British territory, and part of the country made subject to the Legislature of Newfoundland."

We regard it as established that, as between nations, the minimum limit of the territorial jurisdiction of a nation over tide waters is a marine league from its coast, and that bays wholly within its territory not exceeding two marine leagues in width at the mouth are within this limit, and that included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or free-moving fish like lobsters, or fish attached to or imbedded in the soil. The open sea within this limit is of course subject to the common right of navigation; and all governments, for the purpose of self-protection in time of war, or for the prevention of frauds on the revenue, exercise an authority beyond this limit. We have no doubt that the British Crown will claim the ownership of the soil in the bays and in the open sea adjacent to the coast of Great Britain, to at least this extent, whenever there is any occasion to determine the ownership. The authorities are collected in Gould on Waters, Part I. cc. 1, 2, and notes. See also *Neill* v. *Duke of Devonshire,* 8 App. Cas. 135; *Gammell* v. *Commissioners of Woods and Forests,* 3 Macq. 419; *Mowat* v.

*McFee*, 5 Sup. Ct. of Canada, 66; *The Queen* v. *Cubitt*, 22 Q. B. D. 622; St. 46 & 47 Vict. c. 22.

But it is argued that, if the fisheries of Buzzard's Bay are within the control of either the State of Massachusetts or of the United States, this control, by the Constitution of the United States, is exclusively with the United States. The question is, therefore, whether the statutes of Massachusetts which have been cited are repugnant to the Constitution and laws of the United States. There is no belt of land under the sea adjacent to the coast which is the property of the United States, and not the property of the States. It is conceded that the case of *Dunham* v. *Lamphere*, 3 Gray, 268, is decisive of the case at bar if that case was correctly decided. That case was decided before the passage of the St. of 1859, c. 289, and the place where the acts complained of were done was not within a bay, but in the sea within one mile of Gravel Island. Shaw, C. J., says, in the opinion (pp. 269, 270): " Being within a mile of the shore puts it beyond doubt that it was within the territorial limits of the State, although there might in many cases be some difficulty in ascertaining precisely where that limit is. We suppose the rule to be, that these limits extend a marine league, or three geographical miles, from the shore; and in ascertaining the line of shore this limit does not follow each narrow inlet or arm of the sea; but when the inlet is so narrow that persons and objects can be discerned across it by the naked eye, the line of territorial jurisdiction stretches across from one headland to the other of such inlet." He then proceeds to discuss the question, " whether the right of property and of dominion and government over the sea-coast fisheries, and all fisheries in tide waters and arms of the sea, belong properly to the general government, or remain with the State government"; and he concludes that, " in the distribution of powers between the general and State governments," " the right to the fisheries, and the power to regulate the use of the fisheries on the coasts and in the tide waters of the State," were left by the Constitution of the United States with the States, " subject only to such powers as Congress may justly exercise in the regulation of commerce, foreign and domestic "; and he says, " That the exercise of both of these are not inconsistent, and therefore not in conflict with

each other, was also settled by the Supreme Court of the United States, in the case of *Willson* v. *Blackbird Creek Marsh Co.* 2 Pet. 245." In *Dunham* v. *Lamphere*, the defendant was a citizen of the State of Rhode Island, and the owner and master of a fishing vessel which had been duly licensed as a fishing vessel pursuant to the laws of the United States; but it is said that this license did not affect the question.

We are asked to reconsider that decision mainly on the ground that the admiralty and maritime jurisdiction of the courts of the United States was not considered in the opinion. It has indeed been suggested that the recent decisions of the Supreme Court of the United States upon the power of Congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," (Const. U. S., Art. I. Sect. 8,) require that this decision be reconsidered; but no recent decisions of that court have been cited which relate to the regulation and control of the fisheries within the territorial tide waters of a State, and the decisions of that court which relate to this subject are considered hereafter, and they do not appear to be in conflict with the decision in *Dunham* v. *Lamphere*. So far as we know, it has never been decided anywhere that the regulation of the fisheries within the territorial limits of a State is a regulation of commerce; the decisions are, that the control of the fisheries is not included in the grant of power to Congress to regulate commerce. In all treaties and international relations, the subject of coast fisheries is regarded as distinct from that of commerce. The argument addressed to us is, that by the Constitution of the United States the judicial power of the United States extends "to all cases of admiralty and maritime jurisdiction" (Const. U. S., Art. III. Sect. 2); that this power is exclusive; that the case at bar is within this jurisdiction, and that therefore the courts of Massachusetts have no jurisdiction over it. It must, we think, be considered as settled, that, if land on the coast be reclaimed from the sea, or if piers or wharves be extended into the sea, such land and structures are a part of the territory of the State whose shores they adjoin. *Pollard* v. *Hagan*, 3 How. 212. *Weber* v. *Harbor Commissioners*, 18 Wall. 57. *Commonwealth* v. *Alger*, 7 Cush. 53. *Commonwealth* v. *Roxbury*, 9 Gray, 451. *Boston* v. *Richardson*, 105 Mass.

351.  *Galveston* v. *Menard,* 23 Texas, 349.  *Barney* v. *Keokuk,* 94 U. S. 324.

In *McCready* v. *Virginia,* 94 U. S. 391, it is said in the opinion : " The precise question to be determined in this case is, whether the State of Virginia can prohibit the citizens of other States from planting oysters in Ware River, a stream in that State where the tide ebbs and flows, when its own citizens have that privilege.  The principle has long been settled in this court, that each State owns the beds of all tide waters within its jurisdiction, unless they have been granted away.  *Pollard's Lessee* v. *Hagan,* 3 How. 212; *Smith* v. *Maryland,* 18 How. 74; *Mumford* v. *Wardwell,* 6 Wall. 436; *Weber* v. *Harbor Commissioners,* 18 id. 66.  In like manner, the States own the tide waters themselves, and the fish in them, so far as they are capable of ownership while running.  For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty.  *Martin* v. *Waddell,* 16 Pet. 410.  The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States.  There has been, however, no such grant of power over the fisheries.  These remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate its tide waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation.  Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property.  The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined.  It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

In *Smith* v. *Maryland,* 18 How. 71, 74, every question was discussed which arises in the case at bar except the question whether the place where the acts of the present defendant were done was within the territory of Massachusetts.  In that case the plaintiff in error was a citizen of Pennsylvania, and owner of a sloop licensed to be employed in the coasting trade and fisheries, which was seized by the sheriff of Anne Arundel County in Maryland while engaged in dredging for oysters in

Chesapeake Bay, in violation of a statute of Maryland enacted for the purpose of preventing the destruction of oysters in the waters of that State. The questions presented and argued were, whether that statute was repugnant to those provisions of the Constitution of the United States which grant to Congress the power to regulate commerce, or to those which declare that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction, or which declare that the citizens of each State "shall be entitled to all privileges and immunities of citizens in the several States." (Const. U. S., Art. IV. Sect. 2.) Mr. Justice Curtis, in delivering the opinion, says: "Whatever soil below low-water mark is the subject of exclusive propriety and ownership, belongs to the State on whose maritime border, and within whose territory, it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory before the Declaration of Independence. *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Martin* v. *Waddell*, 16 Pet. 367; *Den* v. *The Jersey Co.* 15 How. 426. But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shell-fish as floating fish." He also says, that the statute of Maryland does "not touch the subject of the common liberty of taking oysters, save for the purpose of guarding it from injury, to whomsoever it may belong, and by whomsoever it may be enjoyed. Whether this liberty belongs exclusively to the citizens of the State of Maryland, or may lawfully be enjoyed in common by all citizens of the United States; whether this public use may be restricted by the State to its own citizens, or a part of them, or by force of the Constitution of the United States must remain common to all citizens of the United States; whether the national government, by a treaty or act of Congress, can grant to foreigners the right to participate therein; or what, in general, are the limits of the trust upon which the State holds this soil, or its power to define and control that trust, are matters wholly without the scope of this case, and upon which we give no opinion." Upon the question of the admiralty jurisdiction, he says: "But we consider it to have been settled by this court, in *United States* v. *Bevans*, 3 Wheat. 386, that this clause in the Constitution did

not affect the jurisdiction nor the legislative power of the States, over so much of their territory as lies below high-water mark, save that they parted with the power so to legislate as to conflict with the admiralty jurisdiction or laws of the United States. As this law conflicts neither with the admiralty jurisdiction of any court of the United States conferred by Congress, nor with any law of Congress whatever, we are of opinion it is not repugnant to this clause of the Constitution." He also held that it was not repugnant to the clause of the Constitution which conferred upon Congress the power to regulate commerce, and that the enrolment and license of the vessel conferred upon the plaintiff in error no right to violate the statute of Maryland. It is said in the opinion : " No question was made in the court below whether the place in question be within the territory of the State. The law is, in terms, limited to the waters of the State." The question, therefore, did not arise " whether a voyage of a vessel, licensed and enrolled for the coasting trade, had been interrupted by force of a law of a State while on the high seas, and out of the territorial jurisdiction of such State." The dimensions of Chesapeake Bay do not appear in the report of the case, but it has been said that this bay is " twelve miles across at the ocean." 1 Bish. Crim. Law, (7th ed.) § 105. It is a bay considerably larger than Buzzard's Bay, and is not wholly within the State of Maryland, although at the point where Anne Arundel County bounds upon it the bay is wholly within that State. See *Haney* v. *Compton*, 7 Vroom, 507 ; *Corfield* v. *Coryell*, 4 Wash. C. C. 371 ; *Weston* v. *Sampson*, 8 Cush. 347 ; *Mahler* v. *Norwich & New York Transportation Co.* 35 N. Y. 352 ; *United States* v. *Smiley*, 6 Sawyer, 640.

The argument from the grant of judicial power to the United States in all cases of admiralty and maritime jurisdiction proceeds upon the theory that the jurisdiction thus granted is the jurisdiction as to subject matter and place which courts of admiralty exercised in England when the Constitution was adopted; and that this is an exclusive jurisdiction, civil and criminal, which is fixed and cannot be changed by legislation. But in civil causes the jurisdiction both as to subject matter and place is not exactly that of the Courts of Admiralty of England at any time ; and this jurisdiction can within certain limits be

changed by Congress, and under the existing laws personal suits on maritime contracts or for maritime torts can be maintained in the State courts; and the courts of the United States, merely by virtue of this grant of judicial power, have no criminal jurisdiction whatever. The criminal jurisdiction of the courts of the United States is wholly derived from the statutes of the United States; and these statutes, so far as they have been passed under the grant of admiralty and maritime jurisdiction, for the punishment of offences committed on the high seas, or in bays and arms of the sea, have usually been confined to offences committed "out of the jurisdiction of any particular State." U. S. Rev. Sts. § 5339. *Butler* v. *Boston & Savannah Steamship Co.* 130 U. S. 527. *The Belfast*, 7 Wall. 624. *The Eagle*, 8 Wall. 15. *Leon* v. *Galceron*, 11 Wall. 185. *Steamboat Co.* v. *Chase*, 16 Wall. 522; *S. C.* 9 R. I. 419. *Schoonmaker* v. *Gilmore*, 102 U. S. 118. *Insurance Co.* v. *Dunham*, 11 Wall. 1. *Ex parte Byers*, 32 Fed. Rep. 404.

In each of the cases of *United States* v. *Bevans*, 3 Wheat. 336, and of *Commonwealth* v. *Peters*, 12 Met. 387, the place where the offence was committed was in Boston Harbor; and it was held to be within the jurisdiction of Massachusetts, according to the meaning of the statutes of the United States which punished certain offences committed upon the high seas, or in any river, haven, basin, or bay "out of the jurisdiction of any particular State." The test applied in *Commonwealth* v. *Peters*, which was decided in the year 1847, was that the place was within a bay "not so wide but that persons and objects on the one side can be discerned by the naked eye by persons on the opposite side," and was therefore within the body of a county. In *United States* v. *Bevans*, Marshall, C. J. said: "The jurisdiction of a State is coextensive with its territory; coextensive with its legislative power. The place described is unquestionably within the original territory of Massachusetts. It is then within the jurisdiction of Massachusetts, unless that jurisdiction has been ceded to the United States."

There are no statutes of the United States which, as we construe them, purport to regulate the menhaden fisheries on the coast or within the bays of Massachusetts. The rights granted to British subjects by the treaties of June 5, 1854, and May 8,

1871, to take fish upon the shores of the United States, had expired before the statute of Massachusetts (St. 1886, c. 192) was passed which the defendant is charged with violating. If the place where the offence charged in this case was committed is within the general jurisdiction of Massachusetts, then, according to the principles declared in *Smith* v. *Maryland*, the statute in question is not repugnant to the Constitution and laws of the United States. The contention is, that the jurisdiction of a State as between it and the United States must be confined to the body of counties; and that counties must be defined according to the customary English usage at the time of the adoption of the Constitution of the United States; and that by this usage counties were bounded by the margin of the open sea; and that, as to bays and arms of the sea extending into the land, only such or such parts were included in counties as were so narrow that objects could be distinctly seen from one shore to the other by the naked eye. We are unable to find any indication anywhere that the customary law of England in regard to the boundaries of counties was adopted by the Constitution of the United States as a measure to determine the territorial jurisdiction of the States. The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the State. In *United States* v. *Bevans*, Marshall, C. J., in the opinion, asks the following questions: "Can the cession of all cases of admiralty and maritime jurisdiction be construed into a cession of the waters on which those cases may arise?" "As the powers of the respective governments now stand, if two citizens of Massachusetts step into shallow water where the tide flows, and fight a duel, are they not within the jurisdiction, and punishable by the laws, of Massachusetts?" It would be a startling proposition that all persons who step into tide water on the open coast of Massachusetts are while they remain there wholly beyond the jurisdiction of the State. The statutes of the United States define and punish but few offences on the high seas, and, unless other offences when committed in the sea near the coast can be punished by the States, there is a large immunity from punishment for acts

which ought to be punishable as criminal. There are reasons, perhaps, why the States should not exercise in all respects the same authority over the open sea near the shore as over bays within their limits; and Congress or the courts of the United States might refuse to recognize the right of a State by statute to extend its territorial limits beyond what is generally recognized as the territorial limits of states by the law of nations. Within these limits, we think a State can define its boundaries on the sea, and the boundaries of its counties, and by this test the Commonwealth of Massachusetts can include Buzzard's Bay within the limits of its counties.

The statutes of Massachusetts, in regard to bays at least, make definite boundaries which before the passage of the statutes were somewhat indefinite; and, if it were necessary so to consider the statutes, they might well be taken to be a definition of the distance which a person can see, although the origin and history of the statutes have no connection with the English law concerning the boundaries of counties. It is to be noticed that Rhode Island and some other States have passed similar statutes defining their boundaries. Pub. Sts. of Rhode Island of 1882, c. 1, §§ 1, 2; c. 3, § 6. Gould on Waters, § 16 and note. The waters of Buzzard's Bay are, of course, navigable waters of the United States, and the jurisdiction of Massachusetts over them is necessarily limited (*Commonwealth* v. *King*, 150 Mass. 221); but we have no occasion to consider the power of the United States to regulate or control, either by treaty or legislation, the fisheries in these waters, because there are no existing treaties or acts of Congress which seem to us to relate to the menhaden fisheries within such a bay. The statute of Massachusetts which the defendant is charged with violating is in terms confined to waters " within the jurisdiction of this Commonwealth"; and it was passed, we think, for the preservation of the fish, and it makes no discrimination in favor of citizens of Massachusetts and against citizens of other States. If there be a liberty of fishing for swimming fish in the navigable waters of the United States, common to the inhabitants or the citizens of the United States, upon which we express no opinion, the statute may well be considered as an impartial and reasonable regulation of this liberty; and the subject is one which a State may well be permitted to

regulate within its territory, certainly in the absence of any regulation by the United States. The preservation of fish, even although they are not used as food for human beings, but as food for other fish which are so used, is for the common benefit; and we are of opinion that the statute is not repugnant to the Constitution and the laws of the United States. We see no error in the rulings at the trial, and there must be judgment on the verdict.*                                             *So ordered.*

---

* Affirmed in *Manchester* v. *Massachusetts,* 139 U. S. 240.