[Crim. No. 728. Second Appellate District, Division Two.—July 10, 1920.]

In the Matter of the Application of TONY MARINCO-VICH for a Writ of Habeas Corpus.

[1] Evidence—Judicial Notice—Catalina Island.—It is a matter of common knowledge, of which courts will take judicial notice, that persons, when speaking of "Santa Catalina Island," refer to it simply as "Catalina Island," and seldom, if ever, give the full, original Spanish name.

[2] International Law—Waters Adjacent to Shore—Jurisdiction of California.—The rule of international usage that every nation has exclusive jurisdiction over the waters adjacent to its shores to a distance of three miles from shore is applicable to California as though it were an independent, sovereign nation, save only that right of exclusive control over such waters is limited in so far as control may have been granted to the United States.

[3] Id.—Right of Control Over Fisheries.—The dominion of the state or nation over the seas adjoining its shores is for the purpose of protecting its coast from the effects of hostilities between other nations which may be at war, the protection of its revenue, and the preservation of order by its police; and included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or fish attached to or embedded in the soil.

[4] Statutory Construction—Laws in Derogation of Sovereignty. It is a universally recognized canon of construction that laws in derogation of sovereignty shall be construed strictly in favor of the state, and should not be permitted to divest the state or its government of any of its prerogatives, unless the intention to effect that object is clearly expressed.

[5] Fish and Game—State Waters—Extent of State Sovereignty. The sovereignty of the state of California extends over a belt of water three miles wide around the islands along and adjacent to her coast; and the waters lying within a belt three miles wide around Catalina Island are the "state waters" referred to in the statutory definition of fish and game districts twenty and twenty "A" (Stats. 1917, p. 1061).

[6] Id.—Power of Legislature to Protect Fish—Discretion.—Wild game, which includes fish, belong to all the people of the state;

3. Government control over right to fish generally, notes, 21 **Ann. Cas.** 777; 39 **L. R. A.** 581; 60 **L. R. A.** 481; **L. R. A.** 1916E, 523.

and the legislature, as the law-making representative of all the people, may dispose of the fish in the state's deep-sea waters on such terms as to it may seem best—subject only to the contitutional limitations against discrimination—and for the protection of fish, may pass such laws as to it may seem most wise; and the courts cannot review its discretion.

[7] ID.—CONSTRUCTION OF SECTION 636, PENAL CODE—SUFFICIENCY OF TITLE—AUTHORIZED SPECIAL LEGISLATION.—The title to the act whereby section 636 of the Penal Code was amended, reading "An act to amend section six hundred and thirty-six of the Penal Code, relating to the protection of fish. and game," does not violate the requirement of section 24, article IV, of the constitution, that every act shall embrace but one subject, which subject shall be expressed in the title; nor is that section amenable to the objection that it is local or special legislation and therefore violative of subdivision 2 of section 25 of article IV of the constitution, such legislation being specially authorized by section 25½ of article IV of the constitution.

PROCEEDING on Habeas Corpus to secure the release of petitioner from custody on a charge of violating section 636 of the Penal Code. Writ discharged and petitioner remanded.

. The facts are stated in the opinion of the court.

C. W. Pendleton and Henry E. Carter for Petitioner.

Thomas Lee Woolwine, District Attorney, and W. J. Clark for Respondent.

FINLAYSON, P. J.—Petitioner was arrested for a violation of section 636 of the Penal Code. He is charged with having had in his possession, in fish and game district No. 20, a net measuring more than six feet in its greatest breadth and which was not a dip net for taking fish to be used as bait only. He attacks the constitutionality of this code section, particularly in so far as it relates to fish and game district No. 20, claiming that California has no jurisdiction over the waters referred to as "state waters" in the statutory definition of fish and game district No. 20 (Stats. 1917, p. 1061); that the statutory description of that district is fatally indefinite and uncertain; and that section 636 violates section 25 of article I and section 24 and subdivision 2

of section 25 of article IV of the state constitution. We think that none of these contentions is tenable.

Section 636 provides that it shall be unlawful for any person to have in his possession, in fish and game district No. 20, any net other than a dip net for taking fish to be used as bait, and that such dip net for catching bait shall not measure more than six feet in its greatest breadth. (Sec. 636, Penal Code, as amended July 22, 1919, Stats. 1919, pp. 422, 423.) By the act of July 27, 1917, whereby the state is divided into fish and game districts, districts twenty and twenty "A" are described as follows: "Sec. 47. Fish and game district twenty shall consist of and include Catalina island and that portion of the state waters lying between a line extending south from the southeasterly shore in line with and intersecting South East rock; thence around the east end to the north side of a line extending west from the extreme west end of said island. Sec. 48. Fish and game district twenty 'A' shall consist of and include that portion of the state waters around Catalina island not included in fish and game district twenty." (Stats. 1917, p. 1061.)

[1] There is no merit in petitioner's claim that there is no island along or adjacent to our coast known as Catalina island. It doubtless is true, as petitioner says, that the correct name of this island is its old and original Spanish name, "Santa Catalina Island;" but we may not close our eyes and ears to facts of common knowledge, and this court cannot affect to be ignorant of the fact that probably as many as nine out of every ten persons met with on the street, when speaking of this island, refer to it simply as "Catalina Island," and seldom, if ever, give the full, original Spanish name. It is due to petitioner to say that he does not urge this hypercriticism with any great degree of strenuousness. His principal contention, as we understand it, is that there are no "state waters" around this island over which the state has jurisdiction to regulate fishing.

Unless the people of the state, in their definition of the state's boundary as contained in article XXI of the constitution, have decreed otherwise, the sovereignty and jurisdiction of California extends over a belt of water, three miles wide, circling the island, and the waters of such belt are territorial waters of the state—they are the "state

waters'' referred to in the statutory definition of fish and game district twenty.

If the extent of California's jurisdiction is to be determined according to the general rule, based upon usage uniformly recognized by the law of nations, there can be no doubt that it includes a zone of water, three miles wide, around Catalina island. **[2]** All the writers upon public law agree that every nation has exclusive jurisdiction over the waters adjacent to its shores to a distance of three miles from shore, or, as it is frequently expressed, ''the distance of a cannon shot from shore.'' The distance of three geographical miles was fixed at a time when no gun could force a ball farther. This rule of international usage is applicable to California just as though it were an independent, sovereign nation, save only that its right of exclusive control over such waters is limited in so far as control may have been granted to the United States. (*Manchester* v. *Massachusetts,* 139 U. S. 234, [35 L. Ed. 159, 11 Sup. Ct. Rep. 559, see, also, Rose's U. S. Notes] ; *Humboldt L. M. Assn.* v. *Christopherson,* 73 Fed. 239, [46 L. R. A. 264, 19 C. C. A. 481].) In Wheaton on International Law, eighth edition, section 177, the maritime territorial jurisdiction of an independent nation is defined as follows: ''The maritime territory of every state extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of the sea enclosed by headlands belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or so far as a cannon shot will reach from the shore along the coasts of the state. Within these limits its right of property and territorial jurisdiction are absolute, and exclude those of every other nation.'' **[3]** The dominion of the state or nation over the seas adjoining its shores is for the purpose of protecting its coast from the effects of hostilities between other nations which may be at war, the protection of its revenue, and the preservation of order by its police. Included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or fish attached to or embedded in the soil. (*Massachusetts* v. *Manchester,* 152 Mass. 230, [23 Am. St. Rep. 820, 9 L. R. A. 236, 25 N. E. 113] ; *Manchester* v. *Massachusetts, supra; Dunham* v. *Lamphere,* 3 Gray (Mass.), 268; *Humboldt L. M.*

*Assn.* v. *Christopherson, supra;* notes to *State* v. *Shaw,* 67 Ohio St. 157, [60 L. R. A. 481, 65 N. E. 875] ; 16 Am. & Eng. Ency. of Law, 2d ed., 1132; 36 Cyc. 830.) ·

There is just as much reason for the extension of state sovereignty over a three-mile belt around Catalina island as there is for the extension of sovereignty over a three-mile zone along and off the shore of the mainland. In the one case, as in the other, such jurisdiction is necessary to an adequate exercise of, the state's police powers and to protect the coast from the effects of hostilities by other nations at war. That a state's sovereignty extends over a three-mile belt around islands that lie along and adjacent to its shores was evidently the opinion of Secretary Bayard, who, in 1886, wrote to Mr. Manning, the then Secretary of the Treasury, as follows: "We may therefore regard it as settled . . . that, so far as concerns the eastern coast of North America, the position of this department has uniformly been that the sovereignty of the shore does not, so far as territorial authority is concerned, extend beyond three miles from low-water mark, and that the seaward boundaries of this zone of territorial waters follows the coast of the mainland, *extending where there are islands so as to place around such islands the same belt."* (Italics ours.)   (See 1 Wharton's Dig. Int. Law, sec. 32.)   We conclude, therefore, that, unless the people of the state, in their definition of the state's boundary as set forth in article XXI of the constitution, have deliberately excluded such waters from the territory over which the state's sovereignty extends, the state has jurisdiction over a belt of water, three miles wide, around each of the islands that lie along and adjacent to our shores.

We have no fault to find with petitioner's contention that the sovereignty and jurisdiction of this state extend only to such places as are within its boundaries as established by the constitution. (Pol. Code, sec. 33.)   But we do not think that the boundary of California, as defined in the constitution, necessarily precludes the idea that the state has sovereignty and jurisdiction over a three-mile belt of waters around each of the islands along and adjacent to the coast. Article XXI of the constitution, in its definition of California's boundary, after tracing it to a line between the United States and Mexico, proceeds as follows: "Thence

running west and along said boundary to the Pacific Ocean, and extending therein three English miles; thence running in a northwesterly direction and following the direction of the Pacific Ocean to the forty-second degree north latitude; thence on the line of said forty-second degree of north latitude to the place of beginning. Also including all the islands, harbors, and bays along and adjacent to the coast.'' Because this language of the state's organic law expressly extends the boundary of the mainland three miles into the ocean, and does not similarly and expressly extend the seaward boundary of the islands that are along and adjacent to the coast, it is argued that it was not intended that the boundary of any of these offshore islands should include any surrounding zone or belt of ocean waters.

[4] It is a universally recognized canon of construction that laws in derogation of sovereignty shall be construed strictly in favor of the state, and should not be permitted to divest the state or its government of any of its prerogatives unless the intention to effect that object is clearly expressed. [5] As we already have pointed out, California, according to the decisions of the federal supreme court and the opinions of writers on international law, acquired, on her admission to the union, the sovereignty of an independent nation over a zone of waters three miles wide extending along the mainland, and also over similar zones or belts around the islands along and adjacent to her coast, unless, by her own definition of her boundary, the state has deliberately excluded such waters from her territory and jurisdiction. In defining its boundary in its organic law, the state has not expressly said that it shall not include any zones or belts of waters around the islands that lie along and adjacent to the coast. Nor has the state, in its definition of her boundary, clearly and unequivocally expressed an intention to reject that sovereignty which, unless clearly renounced by her, she rightfully has over a belt of water, three miles wide, girdling each of such islands. We are satisfied, therefore, that under the canon of construction to which we have adverted, it must be held that the state's sovereignty extends over a belt of water, three miles wide, around each of such islands, and that such waters are the ''state waters'' referred to in the statutory definition of fish and game district twenty. The same conclusion was reached by division one of the dis-

trict court of appeal for this district in the recently decided case of *Suttori* v. *Peckham,* 48 Cal. App. 88, 191 Pac. 960.

There is no uncertainty in the statutory definition of fish and game district twenty. Santa Catalina Island, or, as it is popularly known, Catalina Island, is an island in the Pacific Ocean situated about seven leagues off the mainland of southern California, and separated therefrom by the San Pedro Channel. It is a part of Los Angeles County. The island extends in a northwesterly and southeasterly direction, its longitudinal course, in a general way, paralleling the shore line of the mainland. As will be recalled, the act whereby the state is divided into fish and game districts defines, in section 47, district twenty as consisting of the island and ''that portion of the state waters lying between a line extending south from the southeasterly shore in line with and intersecting South East Rock; thence around the east end to the north side of a line extending west from the extreme west end of said island.'' There is no ambiguity or uncertainty here. For reasons already stated, the ''state waters'' referred to by the act consist of a zone of waters, three miles wide, surrounding the island. That, by the words ''that portion of the state waters,'' as that phrase is used in section 47 of the act, the legislature intended to refer to a portion of the three-mile belt or girdle of ocean waters that encompasses the island of Catalina, and not some other island or place, is made manifest by the fact that in the next section—section 48—it is said that fish and game district twenty ''A'' shall consist of ''that portion of the state waters *around Catalina Island* not included in fish and game district twenty.'' The ''portion of the state waters'' that comprises fish and game district twenty consists, therefore, of that segment of the three-mile belt around the island which lies east and north of a line extended due south through the rock known on Coast Survey Charts as South East Rock, and commonly called Church Rock, and includes to a line extended due west from the most westerly extremity, or northwesterly end, of the island. A glance at any map will show that the ''state waters'' between these two lines are those ''state waters''—that is, zone of waters three miles wide—that extend along and landward from the southeasterly extremity of the island and face the mainland. The remaining portion of the ''state

waters'' that comprise the three-mile belt around the island is in fish and game district twenty ''A.''

There is no conflict between section 636 of the Penal Code and section 25, article I, of the constitution—added by the amendment of 1910. By this amendment to the organic law the people were given no right, with respect to deep-sea fishing, not previously possessed by them. (*Paladini* v. *Superior Court*, 178 Cal. 369, [173 Pac. 588].) **[6]** Wild game (included within which is fish, *People* v. *Truckee Lumber Co.*, 116 Cal. 397, [58 Am. St. Rep. 183, 39 L. R. A. 581, 48 Pac. 374]) always has belonged to all the people of the state. It is evident, therefore, that what the people of the state own they can alienate on such terms as they choose to impose, and that the legislature, as the law-making representative of all the people, may dispose of the fish in the state's deep-sea waters on such terms as to it may seem best—subject only to the constitutional limitations against discrimination. Within those limitations, the legislature, for the protection of fish, may pass such laws as to it may seem most wise. The measures best adapted to that end are for the legislature to determine; and the courts cannot review its discretion. (*Ex parte Kenneke*, 136 Cal. 527, [89 Am. St. Rep. 177, 69 Pac. 261]; *In re Phoedovius*, 177 Cal. 238, 242, [170 Pac. 412].) ''The ownership being in the people of the state, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game, or qualify or restrict, as in the opinions of its members will best subserve the public welfare.'' (*Geer* v. *Connecticut*, 161 U. S. 519, 533, [40 L. Ed. 793, 16 Sup. Ct. Rep. 600, 606, see, also, Rose's U. S. Notes].) It has been held that a statute making it unlawful to fish in the waters of the state with intent to sell or trade the fish after they are caught is not unconstitutional even though the act benefits none but wealthy sportsmen. (*State* v. *Dow*, 70 N. H. 286, [53 L. R. A. 314, 47 Atl. 734].) In this New Hampshire case, the court, holding that the act was not discriminatory, employed this language: ''It is not apparent in what way the defendant is denied any right granted to others. If they [the wealthy sportsmen] may fish, so may he [the defendant]; and the prohibi-

tion of his fishing with intent to sell the fish to them equally enjoins them from fishing with intent to sell their fish to him. 'The statute makes no discrimination. . . . Everybody is prohibited.' True it is that the prohibition affects some more than others. 'Such is necessarily the effect of all restrictive laws. . . . The equality of the constitution is the equality of persons, and not of places,—the equality of right, and not of enjoyment. A law that confers equal rights on all citizens of the state, or subjects them to equal burdens, and inflicts equal penalties on every person who violates it, is an equal law.' ".

These principles were not changed by the addition of section 25 to article I of the constitution. The principal purpose of that amendment was to preserve to the people the right to fish upon the public lands of the state, and to require that grants of land by the state should not be made "without reserving to the people the absolute right to fish thereon." The proviso of the section authorizing the legislature to fix "the season when and the conditions under which the different species of fish may be taken" was intended to leave the matter exactly as it was before the section was added, except as it restricted the power to alienate the public land without such reservation or to create private fisheries thereon. (*Paladini* v. *Superior Court,* 178 Cal. 369, [173 Pac. 588].)

[7] The title to the act whereby section 636 was last amended does not violate the requirement of section 24, article IV, of the constitution, that every act shall embrace but one subject, which subject shall be expressed in the title. The title of the act whereby the section was last amended reads: "An act to amend section six hundred and thirty-six of the Penal Code, relating to the protection of fish and game." (Stats. 1919, p. 420.) The act relates wholly to the "protection of fish and game," and nothing else. It comprises but one subject, and that subject, the protection of fish and game, is expressed in its title. Nor is the section amenable to the objection that it is local or special legislation and therefore violative of subdivision 2 of section 25 of article IV. Section 25½ of article IV of the constitution, added in 1902, reads: "The legislature may provide for the division of the state into fish and game districts, and may enact such laws for the protection of fish and game

therein as it may deem appropriate to the respective districts.'' The purpose of this section is to remove certain of the restrictions, imposed by the preceding section, against local and special legislation, by specifically authorizing local legislation for the protection of fish and game. (*Paladini* v. *Superior Court, supra.*)

We see no ground upon which the legislation that is made the object of petitioner's attack may be held invalid.

Petitioner is remanded and the writ discharged.

Thomas, J., and Weller, J., concurred.