STATE OF MAINE *vs.* ARCHIE RUVIDO.

Knox.    Opinion, September 20, 1940.

*Jerome C. Burrows*, County Attorney for the State.
*Philip G. Willard*, for respondent.

SITTING: BARNES, C. J., STURGIS, THAXTER, HUDSON, MANSER, WORSTER, JJ.

THAXTER, J. The respondent, a resident of Boston, in the Commonwealth of Massachusetts, was the captain of a fishing schooner and was charged in a complaint issued from the municipal court of the City of Rockland with a violation of P. L. 1937, Chap. 32, the essential part of which reads as follows:

"The taking or fishing for by a non-resident of the state of Maine, for commercial purposes, any kind of ground fish, by hook, line, trawl or in any other manner, within the territorial waters of the state between the 1st day of April and the 1st day of November in each year for a period of 5 years, is hereby prohibited."

The offense is set forth in the complaint as follows:

"Charles W. Carver of Rockland complains on August 12th, 1939, that Archie Ruvido of Boston, Massachusetts, on a certain day between the First day of April and the First day of November, A. D. 1939, to wit, on the 12th day of August, A. D. 1939, in the waters of Penobscot Bay near Seal Island, in the County of Knox aforesaid, did fish for and take for commercial purposes ground fish by means of beam trawler, said waters of Penobscot Bay near Seal Island being within the territorial waters of the State of Maine against the peace of the State and contrary to the form of Statute in such case made and provided."

The respondent was arraigned in the municipal court, pleaded not guilty, after a hearing was found guilty and sentenced, and then filed an appeal which was duly entered in the Superior Court for the County of Knox. The case is reported to this court on an agreed statement of fact.

It is admitted that the respondent, being a non-resident, did on the twelfth day of August, 1939, fish for and take for commercial purposes ground fish by means of a beam trawler at a point off the coast of Maine, said point being between one and three miles north northeast of an island known as Seal Island, which point is marked on a chart of "Penobscot Bay and Approaches," which is made a part of the agreed statement.

The primary question reserved for the consideration of this court is whether the offense was committed within the territorial waters of the State of Maine over which the state has general jurisdiction and sovereignty. Also this court is asked to determine whether the State has under the provisions of the statute here involved assumed jurisdiction and sovereignty over such waters; also whether the statute is not void or inoperative by reason of the uncertainty of its provisions.

If the court shall determine these issues in favor of the State, an entry is to be made "Judgment for the State," otherwise the entry is to be "Complaint Dismissed."

From earliest times it has been conceded that the sovereignty of nations bordering on the sea does not stop at the shore, but that for

some distance at least it extends over and under the ocean. Such control has been regarded as necessary for the security of those living on the coast and as proper to assure the full enjoyment by them of the land which they inhabit. On the American Revolution dominion over these waters became vested in the several states, and there it still remains except in so far as they may by the Constitution have surrendered such control to the federal government. 1 Moore, A Digest of International Law, 702, H. R. Doc., No. 551, 56 Cong., 2d Sess. But the jurisdiction of the United States courts over these waters in admiralty and maritime causes, and the powers given to Congress under the commerce clause of the Constitution still leave the authority of the several states substantially unimpaired. The State of Maine, therefore, still is sovereign over the seas which wash its coast and may if it sees fit deny to non-residents the right to fish in these waters. Gould, Waters (1883) 331 ; *McCready* v. *Commonwealth of Virginia*, 94 U. S., 391 ; *Corfield* v. *Coryell*, 4 Wash., C. C. 371, Fed. Cas. No. 3230 ; *Bennett* v. *Boggs*, 1 Baldw., C. C. 60, Fed. Cas. No., 1319 ; *Haney* v. *Compton*, 36 N. J. L., 507 ; See *Dunham* v. *Lamphere*, 3 Gray, 268, 275, 276.

The problem, however, which we have to settle is the extent of the waters over which this state may exercise its authority.

Grotius laid down the doctrine that territorial rights extended over as much of the sea as could be defended from the shore. Grotius, The Law of War and Peace, Book II, Chap. 3, Secs. 13-14. Other tests have been suggested but this general principle has remained dominant through the centuries. In 1703 Bynkershoek fixed the limit as a marine league or three miles from the coast, a distance which was then the range of cannon shot. 1 Moore, *supra*, at 699. In spite of the lengthening range of artillery this has remained the test generally applied to the present day.

Our shore in the State of Maine is fringed with thousands of islands, many of which are large and the homes of varied industries, others so wild and inaccessible that they seldom feel the tread of human feet. All are, however, an integral part of our state and to a greater or less extent, as bulwarks against the sea, form our harbors and the calm reaches through which commerce flows up and down our shore. It is, therefore, important for us to know that in determining the extent of our control over the water, these islands are re-

garded as natural appendages of the mainland and as a part of our coast as that word is used in the books. Wheaton, Elements of International Law (Edited by George Grafton Wilson 1936, Part II, Sec. 178).: *The Anna*, 5 C. Rob. Adm. Rep. 385. See *In Re Marincovich*, 48 Cal. App. 474, 192 P., 156, which holds that the sovereignty of the State of California extends for a distance of three miles around Catalina Island, which is twenty-one miles from the mainland.

To what extent the jurisdiction of a state extends to bays enclosed by headlands within its borders is still an open question. Wheaton, *supra*, Sec. 188, expresses the rule as follows: "Thus, in respect to those portions of the sea which form the ports, harbors, bays, and mouths of rivers of any State where the tide ebbs and flows, its exclusive right of property, as well as sovereignty, in these waters, may well be maintained, consistently with both the reasons above mentioned, as applicable to the sea in general. The State possessing the adjacent territory, by which these waters are partially surrounded and inclosed, has that physical power of constantly acting upon them, and, at the same time, of excluding, at its pleasure, the action of any other State or person, which, as we have already seen, constitutes possession. These waters cannot be considered as having been intended by the Creator for the common use of all mankind, any more than the adjacent land, which has already been appropriated by a particular people." This text is in accord with an opinion of Attorney General Edmund Randolph of May 14, 1793 (see 1 Moore, *supra* at 735 *et seq.*), holding that the waters of Delaware Bay are United States territory. See also the report of the Second Court of Commissioners of Alabama Claims in the case of *Stetson* v. *United States*, digested in 1 Moore, *supra* at 741-743, holding that the waters of Chesapeake Bay are within the territory of the United States. See also Note 46 L. R. A., 271. It has been held that the Bay of Monterey and the Bay of San Pedro are territorial waters of the State of California. *Ocean Industries Inc.* v. *The Superior Court of Santa Cruz County*, 200 Cal., 235, 252 P., 722; *United States* v. *Carrillo*, 13 F. Supp., 121. In the attempt to settle the dispute over the Northeastern Fisheries the unratified treaty of 1888 provided that in determining what were exclusively British waters under the convention of October 20, 1818, the three

marine miles under that convention should be measured at bays from a straight line drawn across the part nearest the entrance, at the first point where the width did not exceed ten marine miles. On the other hand in 1886 Mr. Bayard, Secretary of State, in a letter to the Secretary of the Treasury (Wharton, A Digest of the International Law of the United States [1886] 107-108) used the following language: "So far as concerns the eastern coast of North America, the position of this Department has uniformly been that the sovereignty of the shore does not, so far as territorial authority is concerned, extend beyond three miles from low-water mark, and that the seaward boundary of this zone of territorial waters follows the coast of the mainland, extending where there are islands so as to place round such islands the same belt. This necessarily excludes the position that the seaward boundary is to be drawn from headland to headland, and makes it follow closely, at a distance of three miles, the boundary of the shore of the continent or of adjacent islands belonging to the continental sovereign."

In view of all this confusion perhaps the safe guide to follow is found in the following language of the court in the case of *Commonwealth* v. *Manchester*, 152 Mass., 236, 240, 25 N. E., 113, 116: "We regard it as established that, as between nations, the minimum limit of the territorial jurisdiction of a nation over tide waters is a marine league from its coast, and that bays wholly within its territory not exceeding two marine leagues in width at the mouth are within the limit, and that included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or free-moving fish like lobsters, or fish attached to or imbedded in the soil."

What are the facts of the present case?

It was on the outer rim of Penobscot Bay that the respondent was found fishing in violation, as the State claims, of our statute. Both shores of this bay and the large river which forms its headwaters are entirely within our borders. As the river widens into the bay we find many islands. The mainland from the City of Belfast to Rockland and beyond along the Muscle Ridge Channel extending for a distance of approximately twenty-five miles, is the westerly shore of the bay. The mainland extends for a distance of about six miles on the easterly side ending at Cape Rosier. From there on for

nearly twenty miles southerly the easterly shore is formed by many islands among which are the large islands of Deer Isle and the Isle Au Haut. Vinalhaven and North Haven Islands, which are practically one with a narrow passage between them, lie in almost the exact center of the bay between the mainland on the west and the Isle Au Haut on the east. That part of the bay northerly of a line drawn from the mainland below Rockland to the southerly end of Vinalhaven Island and from there to the Isle Au Haut might properly be called the inner bay extending about twenty-five miles from north to south and at its southerly end about eighteen miles from east to west. Farther toward the open ocean in an arc of about seven miles from the center of the southerly line of the inner bay are groups of small islands, Green Island, Matinicus, Ragged Island, Wooden Ball, and Seal Island with which we are concerned the most easterly of the group. At no point is the distance more than six miles between any of these islands or between them and another group which lies close to the mainland on the west, except at the easterly end where the distance between Seal Island and the Isle Au Haut is a little over seven miles. This wide passage forms the easterly entrance to Penobscot Bay. In the center of this wide circle of islets which are the outer bulwark protecting the bay to some extent against the battering of the ocean and about three miles seaward from the outer one of the group lies Matinicus Rock with its lighthouse directing the mariner on his homeward voyage to the westerly openings of the bay on his left and to the easterly entrances on his right.

It is difficult to conceive of a body of water more clearly defined by nature than this, or more easily patrolled and protected by the state which controls its shores. All the islands which surround it are within the State of Maine. The mariner who passes through any of these channels almost instinctively feels himself within our domain. If there is to be with respect to bays any extension of the minimum limit of territorial waters, as laid down in *Commonwealth* v. *Manchester*, supra, it should certainly be applied to this body of water. But it is not necessary for us to decide at this time this interesting question. It is admitted that this respondent was fishing for ground fish within less than three miles of the shore of Seal Island which is a part of the State of Maine and within the County of Knox. Regardless of whether all of Penobscot Bay as such is a part of the terri-

torial waters of this state, the respondent while he was within three miles of Seal Island was fishing within our territorial waters as they have been defined by all text writers. The case now before us cannot be distinguished from *In Re Marincovich*, supra. The doctrine there laid down is in accord with well-settled principles. We therefore hold that the act complained of did take place within the territorial waters of this state over which it has jurisdiction and sovereignty.

The other contentions of the respondent need but passing comment.

He complains because he says this state has not by statute, as has Massachusetts, defined its territorial limits on the coastal waters. Such a statute, however, would be only declaratory of the law. A man cannot "add one cubit unto his stature," and the legislature by its act cannot extend the jurisdiction of the state beyond the limits generally recognized by law. The sovereignty over territorial waters exists even though the state has never seen fit to define their limit. The State of Maine has exercised this authority as to portions of these waters. *McClain* v. *Tillson*, 82 Me., 281, 19 A., 457 ; *State* v. *Thompson*, 85 Me., 189, 27 A., 97. There is no reason why it may not assume control over all. This was certainly the intent of the legislature in enacting the statute here in question.

The respondent claims further that the statute is void for indefiniteness, because it applies to "territorial waters" without defining them. So far as the description of the offense goes, it seems explicit. A statute applicable to the state as a whole is not, however, void because a boundary may be in dispute and there is a consequent doubt of sovereignty over a particular area. And an exercise of control over territorial waters is not void because there may be uncertainty how far they extend. Are not the general statutes of this state applicable to all places within its boundaries and are not territorial waters within those bounds?

In accordance with the stipulation the entry will be

*Judgment for the State.*

(BARNES, C. J., having retired, did not join in this opinion.)