HUMBOLDT LUMBER MANUFACTURERS' ASS'N v. CHRISTOPHERSON et al.[1]

(Circuit Court of Appeals, Ninth Circuit. February 19, 1896.)

No. 183.

1. TOWAGE—NEGLIGENCE OF TUG—CROSSING BAR IN ROUGH WEATHER.
   A tug attempting to tow a schooner from the Pacific Ocean across Humboldt Bar into Humboldt Bay *held* liable for the loss of the tow by capsizing, on the ground that it was gross negligence to try to cross the bar (the sands of which are shifting and uncertain) at a time when the tide was ebbing at near its maximum velocity of about four knots an hour, and a southeast wind blowing at nine miles an hour, so that heavy seas were breaking on the bar in about seven fathoms of water. 60 Fed. 428, affirmed. Hanford, District Judge, dissenting on the evidence.

2. CONSTITUTIONAL LAW—STATE JURISDICTION OF COAST WATERS.
   The rights and jurisdiction of the several states over the sea adjacent to their coasts are those of an independent nation, except as qualified by any right of control granted to the United States by the constitution. And where, by a state's constitution and laws, her boundaries and those of her counties are three miles from the shore, her statutes giving an action for death by negligence are operative within such boundaries where death occurs by negligence in the navigation or towage of vessels. 60 Fed. 428, affirmed. Manchester v. Massachusetts, 11 Sup. Ct. 559, 139 U. S. 264, followed and applied.

3. SHIPPING—EXEMPTIONS FROM LIABILITY—RETROACTIVE LEGISLATION.
   The act of February 13, 1893 (27 Stat. 445), exempting shipowners from liability for loss resulting from errors of navigation, etc., in certain cases, has no retroactive effect, so as to apply to damages occasioned before its passage.

4. DAMAGES—EXCESSIVE AWARDS.
   $7,000 and $5,000, respectively, *held* not excessive awards by a court of admiralty for the death by drowning of the master and cook of a schooner, they being in good health at the time, and earning wages of $100 and $50 per month, respectively; the master being 35, and the cook 39, years old. 60 Fed. 428, affirmed.

Appeal from the District Court of the United States for the Northern District of California.

1 Rehearing pending.

The action grew out of the following facts, as stated by the learned judge who heard the case in the district court:

"On the 16th day of November, 1889, the schooner Fidelity, while being towed from the Pacific Ocean into Humboldt Bay by the steam tug Printer, was capsized on Humboldt Bar. The captain and all hands on board the schooner were drowned, and the vessel itself drifted away, and became a total loss. On March 17, 1890, the Humboldt Lumber Manufacturers' Association, charterer of the steam tug Printer, filed a petition in this court, setting forth the loss of the schooner Fidelity, and alleging that three separate actions had been commenced against the petitioner in the superior court of Humboldt county by persons claiming damages aggregating seventy-five thousand dollars, charged to have accrued to plaintiffs by reason of the loss of the lives of the master and two of the employés of the schooner Fidelity. Petitioner also alleged that it was informed and believed that other persons would claim damages for the loss of life and property in said disaster, and that it desired to contest its liability and the liability of the steam tug Printer for the loss of the schooner Fidelity, her cargo, master, and crew, and also to claim the benefit of the limitation of petitioner's liability under the provisions of sections 4282–4289, inclusive, of the Revised Statutes of the United States. Thereupon, an order was entered by the court, citing all persons who had suffered any loss or damage by reason of the loss of the schooner Fidelity to show cause why an appraisement of the tug Printer should not be made, and why the petitioner should not have such other and further relief in the premises as might be meet and proper, and in the meantime all persons who had brought suits, against the petitioner were restrained and enjoined from the prosecution of the same, as was also the commencement and prosecution of all and any suits against the petitioner as owner or charterer of the steam tug Printer, and in rem against the steam tug Printer, for and on account of any loss or damage arising from the loss of the schooner Fidelity. On May 1, 1890, Henry Wolfe, an administrator of the estate of one who had perished by reason of the disaster, and who, prior to the filing of the petition in this case, had commenced a suit in the state court for damages accruing to the estate by reason of such loss, filed his answer and exceptions to the petition of the Humboldt Lumber Manufacturers' Association, denying, in effect, the jurisdiction of this court, and claiming, further, that, if the court had jurisdiction, the petitioner was not entitled to the benefit of the limited liability act, because the tug Printer, as he alleged, was not engaged in interstate commerce, and therefore was not subject to the national, but to the local, or state, law. The questions raised were argued before the late Judge Hoffman, and on the 7th of May, 1890, the answer and exceptions were overruled. On July 29, 1890, the matter was referred to Southard Hoffman to appraise the value of the tug Printer, and such proceedings were thereafter had that on August 22, 1890, the commissioner filed his report, appraising the value of the tug at $22,500, which appraisement was confirmed by the court on September 5, 1890. On October 6, 1890, an admiralty stipulation in the sum of $22,500 was given and filed. On October 7, 1890, an order was made and filed that a monition issue against certain persons, therein designated, 'and against all persons claiming damages for any loss, destruction, damage, or injury suffered by them, or any of them, or suffered by any decedent represented by them, or any of them, by reason of the loss and destruction of said schooner Fidelity,' citing them to appear before the court and make due proof of their respective claims on or before February 3, 1891. The monition was issued, published, and served as directed by the court, and returned and filed on January 3, 1891. The admission of service as to those on whom the monition was specially directed to be served was filed on February 3, 1891. February 2, 1891, the following answers and claims were filed: Claim of Olivia Christopherson et al., damages for causing death of Captain L. H. Christopherson, who was on the schooner Fidelity when she capsized, and was then drowned, $25,000; claim of Mathilda O. Pederson et al., damages for causing death of Hans C. Pederson in like manner, $25,000; also claims of part owners in the schooner Fidelity, as follows: Geo. W. Rager, one-sixteenth, $1,200; Wm. Wallace, one-sixteenth, $1,200; Wm. F. McDaniels, one-sixteenth, $1,200; Henry Axton, one-sixteenth, $1,200; J. W.

Freese, one thirty-second, $600. No claims were filed by the other part owners, and no explanation is furnished why they have failed to do so."

From the testimony in the case the court found as follows:

"That the petitioner was and is a corporation duly created and existing under the laws of the state of California. That at all times mentioned in said petition and claims said petitioner, the Humboldt Lumber Manufacturers' Association, was the lessee and charterer of the steam tug Printer. That the said steam tug Printer was of about one hundred tons gross measurement, and enrolled and registered in the United States customhouse in San Francisco, state of California, and within the Northern district of California. That at all times mentioned in said petition and the answer thereto and claims therein, the said steam tug Printer was used by the petitioner for the towage of vessels engaged in interstate and foreign commerce from the Pacific Ocean to Humboldt Bay, and from Humboldt Bay to the Pacific Ocean. That on said 16th day of November, 1889, the said steam tug Printer was commanded by one Robert J. Lawson as master and pilot thereof, who was then the servant of said petitioner. That on the 16th day of November, 1889, said steam tug Printer, within the admiralty and maritime jurisdiction of this court, upon the Pacific Ocean, made fast to the sailing schooner Fidelity, and undertook to tow said schooner over and across said Humboldt Bar and into Humboldt Bay, and that while towing said schooner over said Humboldt Bar said schooner Fidelity, by reason of the carelessness and negligence of said tug, was capsized, and all on board thereof perished, and said schooner Fidelity, with all of her stores and personal effects of the master and crew, became a total loss. That at the time the said steam tug Printer arrived at said Humboldt Bar and started to tow said schooner Fidelity across said bar, on said 16th day of November, 1889, it was about nine or a quarter past nine o'clock in the morning, and the tide had been running ebb about two hours, and was approaching its maximum velocity for that time. That the said schooner Fidelity capsized on Humboldt Bar on said 16th day of November, 1889. That said vessel was inward bound, and at the same time was opposite to the entrance to Humboldt Bay, and at a point not greater than two miles from the shore. That the disaster occurred within the admiralty and maritime jurisdiction of the United States, and within the territorial limits and jurisdiction of the state of California. That the said schooner Fidelity capsized at about a quarter past nine o'clock on the morning of the said 16th day of November, 1889. That on said 16th day of November, 1889, said Humboldt Bar was subject to constant changes by reason of the shifting of the sands beneath the waters thereon, and the navigation of said bar could not be safely undertaken by mariners desiring to enter into or proceed out of said Humboldt Bay over said bar, without the assistance of a tug pilot. That at the time and before the steam tug Printer, commanded by the said Robert J. Lawson, as master and pilot thereof, attempted to tow the said schooner Fidelity across said Humboldt Bar, the said Humboldt Bar was in an exceedingly dangerous condition, there being heavy seas breaking on said bar, in and about seven fathoms of water, the tide ebbing thereon at about its maximum velocity, to wit, about four knots an hour, and a southeast wind blowing at the rate of about nine miles an hour. That these turbulent elements combined caused the said bar to be very rough and dangerous for vessels to cross on the said morning of November 16, 1889, at the time the said schooner Fidelity was capsized. That in attempting to cross the said Humboldt Bar on the said 16th day of November, 1889, with the said schooner Fidelity in tow, under the then existing and prevailing conditions, the said petitioner and its said steam tug Printer were guilty of gross and inexcusable carelessness and negligence, and the said schooner Fidelity was capsized and lost, and her said crew drowned, among whom were the said L. H. Christopherson and said Hans C. Pederson, by reason of said carelessness and negligence. That the value of the said schooner Fidelity was $12,000, and the verified claims of the part owners presented and filed herein amount to nine thirty-seconds thereof; and the court finds that the part owners in said schooner have sustained damages to the amount of their respective interests, to wit, $3,375. That the claims of the part owners of the schooner Fidelity are as follows: George W. Rager, a one-sixteenth; William Wallace, a

one-sixteenth; William F. McDaniels, a one-sixteenth; Henry Axton, a one-sixteenth; and J. W. Freese, a one thirty-second. That at the time of the filing of the said petition of the Humboldt Lumber Manufacturers' Association for limitation of its liability for the loss of the schooner Fidelity, and at all of the times mentioned in said petition, said George W. Rager was the owner of an undivided one-sixteenth interest of, in, and to said schooner Fidelity; said William Wallace was the owner of an undivided one-sixteenth interest of, in, and to said schooner Fidelity; William F. McDaniels was the owner of an undivided one-sixteenth interest of, in, and to said schooner Fidelity; said Henry Axton was the owner of an undivided one-sixteenth interest of, in, and to said schooner Fidelity; and said J. W. Freese was the owner of an undivided one thirty-second interest of, in, and to said schooner Fidelity. That L. H. Christopherson was the master, and was on board, of the said schooner Fidelity, and was drowned at the time she was lost. That he was thirty-five years of age, and in good physical condition, at the time of his death, and was in receipt of wages to the amount of $100 per month. That he left, him surviving, as his next of kin and only heirs at law, a widow and two children, namely, Olivia Christopherson, his widow, and claimant in her own right, and Harold Christopherson and Lilia Christopherson, his two children, claimants herein. That Hans C. Pederson was the cook, and was on board of the schooner Fidelity, and was drowned, at the said time she was lost. That he was thirty-nine years of age, and in good physical condition, at the time of his death, and was in receipt of wages to the amount of $50 per month. That he left, him surviving, as his next of kin and only heirs at law, a widow and three children, namely, Mathilda O. Pederson, his widow, and claimant in her own right herein, and Peter Adolph Pederson, John L. Pederson, and Henry C. Pederson, his three children, claimants herein. That the damages sustained by said Olivia Christopherson, widow of said L. H. Christopherson, and his two minor children, Harold Christopherson and Lilia Christopherson, by reason of the death of said L. H. Christopherson, caused by the carelessness and negligence of petitioner, as aforesaid, is $7,000. That the damages sustained by said Mathilda O. Pederson, widow of Hans C. Pederson, and his three minor children, Peter Adolph Pederson, John L. Pederson, and Henry C. Pederson, by reason of the death of said Hans C. Pederson, caused by the gross carelessness and negligence of petitioner, as aforesaid, is $5,000."

Upon which findings it was ordered, adjudged, and decreed: "That the said petitioner, the said Humboldt Lumber Manufacturers' Association, as lessee and charterer of the said steam tug Printer, is entitled to the benefits of the limitations of liability provided for and embodied in sections 4282–4289 of the Revised Statutes of the United States, and the several acts and statutes amendatory thereof and supplementary thereto; and petitioner is liable only to the amount of its interest in said steam tug Printer, appraised and fixed by this court at $22,500.00. It is further ordered, adjudged, and decreed that said claimant and respondent Olivia Christopherson, and her minor children, Harold Christopherson and Lilia Christopherson, recover herein against petitioner, said Humboldt Lumber Manufacturers' Association, the sum of seven thousand (7,000) dollars, together with legal interest thereon from the date hereof. It is further ordered, adjudged, and decreed that said claimant and respondent Mathilda O. Pederson, and her minor children, Peter Adolph Pederson, John L. Pederson, and Henry C. Pederson, recover herein against petitioner, said Humboldt Lumber Manufacturers' Association, the sum of five thousand (5,000) dollars, together with legal interest thereon from the date hereof. It is further ordered, adjudged, and decreed that claimants and respondents, George W. Rager, William Wallace, William F. McDaniels, Henry Axton, and J. W. Freese, part owners of the schooner Fidelity, recover herein against the petitioner, Humboldt Lumber Manufacturers' Association, the sum of three thousand three hundred and seventy-five (3,375) dollars, together with legal interest thereon from the date thereof, the said sum to be proportioned as follows: Two-ninths part thereof, amounting to the sum of seven hundred and fifty (750) dollars, to George W. Rager; two-ninths part thereof, amounting to the sum of seven hundred and fifty (750) dollars, to William Wallace; two-ninths part thereof, amounting to the sum of seven hundred and .fifty (750)

dollars, to William F. McDaniels; two-ninths part thereof, amounting to the sum of seven hundred and fifty (750) dollars, to Henry Axton; and a one-ninth part thereof, amounting to the sum of three hundred and seventy-five (375) dollars, to J. W. Freese. It is further ordered, adjudged, and decreed that claimants and respondents herein recover their costs, taxed at the sum of eighty-two and ninety one-hundredths (82.90) dollars."

It is not disputed that the place of disaster was on Humboldt Bar, off the entrance to Humboldt Bay, and within two miles of the ocean shore.

S. M. Buck, for appellant.

J. N. Gillett, for appellees.

Before McKENNA, Circuit Judge, and HANFORD and HAWLEY, District Judges.

McKENNA, Circuit Judge, after stating the facts as above, delivered the opinion of the court, as follows:

It is contended by appellant that: (1) The evidence does not sustain the finding of the court that the officers of the tug Printer were at fault. (2) There can be no recovery for loss of life, as the disaster occurred on the high seas. (3) If there was liability, it arose while transporting property to a port of the United States, and hence excused from responsibility for damages by section 3 of the act of congress of February 13, 1893. (4) That the damages assessed for the deaths of Christopherson and Pederson are excessive. They were assessed, respectively, as we have seen, at $7,000 and $5,000. The culpability or nonculpability of the master of the tug depends upon the condition of Humboldt Bar at the time he undertook the towage of the Fidelity, and hence to this fact the testimony of the witnesses was addressed. It is conflicting, but the witnesses, if equally competent, do not appear to be equally disinterested. This and other circumstances determine the preponderance of evidence in favor of the findings of the district court. A review of the evidence we shall not undertake. To be satisfactory, it would necessarily have to be circumstantial, and hence very long. Besides, it is unnecessary. It was done by the learned judge of the lower court, and its substantial accuracy we have verified by an independent examination. It is not disputed that the bar is changeable, and requires constant observation and care. It is not disputed that at the time the service was undertaken the tide was ebbing, and that this was a more dangerous condition than though it had been flowing. There is some conflict in the testimony as to its strength, and some as to the wind and roughness of the sea; but it was established or conceded that if the sea was breaking in seven or eight fathoms of water it was too rough for towage. Of the immediate actors in the incident those on the Fidelity were all lost. Of those on the tug three testified,—the captain, the mate, and the steward. The two former aver that the bar was not dangerous, and attribute the accident to an unexpected heavy sea, and the deficiency of ballast in the schooner. The steward, however, testified that the bar that morning (to quote his words) "was rough at times, and at times it wasn't." And he further testified that when the passage of the bar was about to be made he had the following conversation with the captain: "I asked him if he was going in, and he said, 'Yes.'

I told him I thought the bar was rough, and he said for me to go about my business." And to the question, "Were you frightened?" he answered: "Well, I didn't like it very much." In many particulars of seamanship and of the perils of the sea the captain and the steward should not be compared, but to judge of the roughness of a sea seems to be within the skill of any seafaring man. The testimony shows that the witness had two years' familiarity with the bar in service on tugboats,—surely long enough to instruct any observation of its favorable or unfavorable states. Besides, the event confirmed his judgment. We might think this was accidental if there was not corroboration of his judgment by the testimony of others, undoubtedly skilled witnesses, who explicitly testify that the bar was too rough to cross. We have selected this testimony for comment because it was given by actors in the circumstances, and hence has importance for that reason; but other parts of the testimony as well justify the judgment of the district court that the master of the tug was culpably imprudent.

To support its second contention, appellant urges that no liability arose at common law from an act causing the death of another, and that there is no act of congress creating the same. There is a statute of the state of California creating such a liability, and it is conceded that the liability may be enforced in a court of admiralty. In addition to the concession of appellant's counsel, see the case of The Willamette (decided by this court Sept. 18, 1895) 70 Fed. 874. But it is contended that the liability may be enforced only when the act complained of occurs on inland waters, and it is claimed that the act complained of in this case occurred on the high seas, and hence outside of the dominion of the California statute. By the constitution of the state (article 21) the western boundary line is three English miles from the shore, and by section 33 of the Political Code the sovereignty and jurisdiction of the state extends to this boundary; and by the same code the western line of Humboldt county, in its extent, coincides with the state boundary. Therefore, as far as the latter law is concerned, the place of the disaster which is the subject of this suit was within the territorial limits of the state of California. Is it not so in substance of law, as well as the letter? In Wheat. Int. Law, § 177, the maritime territorial jurisdiction of an independent nation is defined as follows:

"The maritime territory of every state extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of the sea inclosed by headlands, belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or as far as a cannon shot will reach from the shore along the coasts of the state. Within these limits its rights of property and territorial jurisdiction are absolute, and exclude those of every other nation."

And in Kent's Commentaries it is laid down that:

"According to the current of modern authority, the general territorial jurisdiction extends into the sea as far as a cannon shot will reach, and no further, and this is generally calculated to be a marine league. * * *"

The jurisdiction of the state of California over the sea is that of an independent nation. U. S. v. Bevans, 3 Wheat. 336; Manchester v. Massachusetts, 139 U. S. 264, 11 Sup. Ct. 559. In the latter case

the contention was presented which is presented in the case at bar. It arose under a statute of a state prohibiting fishing in Buzzard's Bay, except as provided in the act. The defendant violated said act, and was prosecuted and convicted. Mr. Justice Blatchford, speaking for the court, stated, among others, the following, as contentions of the defendant:

"* * * That the proprietary right of Massachusetts is confined to the body of the county; that the offense committed by the defendant was committed outside of that territory, in a locality where legislative control did not rest upon title in the soil and waters, but upon rights of sovereignty inseparably connected with national character, and which were entrusted exclusively to enforcement in admiralty courts; that the commonwealth has no jurisdiction upon the ocean within three miles of the shore; that it could not, by the statute in question, oust the United States of jurisdiction. * * *"

And, discussing these contentions, the learned justice said:

"The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation, and, except so far as any right of control over this territory has been granted to the United States, this control remains with the state."

And further:

"Within what are generally recognized as the territorial limits of states by the law of nations, a state can define its boundaries on the sea, and the boundaries of its counties."

Henry, in his work "Admiralty Jurisdiction and Procedure" (section 12), states the law as follows:

"Sec. 12. But neither the lakes nor the public rivers of the United States are, in a federal sense, highways of the state. A vessel, after leaving a port of a state on a public river, is on a national highway, subject to state jurisdiction for some limited police purposes, which are subordinate to the paramount right of navigation, and the navigable rivers are as much national highways as the high seas are international. The littoral jurisdiction of a state, although extending, for some purposes, beyond low-water mark, is subject to the paramount right of navigation as a highway of the nation, in the same manner as the sea within the three-mile zone from the shore is subject to the right of navigation by foreigners without becoming subject to the local law. Such waters are considered as the common highway of nations, and the jurisdiction of the local authorities exists only for the protection of the coast and its inhabitants, not to subject passing vessels to the local law of the government of the shore."

To sustain this statement the learned author cites the following cases: Reg. v. Keyn, 2 Exch. Div. 63; Collier Co. v. Schurmanns, 1 Johns. & H. 180; The Twee Gebroeders, 3 C. Rob. Adm. 336; The Saxonia, Lush. 410. They are English cases, and citing them makes the meaning of the text doubtful. The text seems to make a distinction between national and state authority. If so, it is disposed of by U. S. v. Bevans and Manchester v. Massachusetts, supra. If it mean to deny authority to both the national and state governments, it is opposed to the same cases, and to Wheaton and Kent, and the authorities they cite, and does not appear to be sustained by the cases quoted to support it, except probably the case of The Saxonia. I say probably, because that case has been interpreted as only deciding the applicability of a particular statute. In The Twee Gebroeders, Sir W. Scott speaks of the sea within three miles of Friedland as "waters belonging to Prussia." In Collier Co. v. Schur-

manns, it was decided that the limitation upon the liability of a shipowner in a case of a collision under one of the merchant shipping acts, applied to a case of damage done to a foreign ship within three miles of the English coast, though foreign ships are not mentioned in the act. It was said in that case, of the three-mile limit:

"It is not questioned that there is a right of interference for defense and revenue purposes, and it is difficult to understand why a country having this kind of territorial jurisdiction over a certain portion of the highroad of nations should not exercise the right of settling the rules of the road in the interests of commerce. An exercise of jurisdiction for such a purpose would be at least as beneficial as for the purpose of defense and revenue."

Reg. v. Keyn occupies about 270 pages of the report; hence it is too long for review, and, besides, was concerned with some questions with which the case at bar is not. It was a criminal case. Keyn was indicted at the central criminal court for manslaughter. He was a foreigner, and in command of a foreign ship passing within three miles off the shore of England, on a voyage to a foreign port; and while within that distance his ship ran into a British ship, and sank her, whereby a passenger on board the latter ship was drowned. The facts of the case were such as to amount to manslaughter by English law. The ultimate question was the jurisdiction of the central criminal court. This depended not only on dominion over the three-mile limit, but upon certain statutes, and on the absence of an enabling enactment. The court was not unanimous on any of the propositions, and the agreement of the majority was only as to the latter; that is, the absence of a statute. The minority of the court was firm in the conviction that the sea within three miles of the coast of England was part of its territory. Lord Chief Justice Cockburn rendered the opinion of the majority, and if it may be said that he accurately opposed the reasoning and conclusion of the minority, he nevertheless based his judgment as well on other grounds, and it was only in the judgment that others of the minority concurred. Lush, J., in his concurring opinion, makes a distinction between the dominion of parliament and the dominion of the common law, and excludes the three-mile limit only from the latter. In concluding, he said:

"Therefore, although as between nation and nation these waters are British territory, as being under the exclusive dominion of Great Britain, in judicial language they are out of the realm, and any exercise of criminal jurisdiction over a foreign ship in these waters must, in my judgment, be authorized by an act of parliament."

The lord chief justice also conceded the power of parliament, and jurisdiction for certain purposes, including fishing, finding sufficient, or at least not dissenting from the sufficiency of, the reasoning for the latter. But if the jurisdiction be one of legislative power, if it exist in England it must exist in the United States, disregarding now, as not a condition of our inquiry, the difference between control over domestic and control over foreign ships. If it exist in the United States, it is either in the national or in the state governments. In which it is we have already considered, and can only repeat what Justice Blatchford said in Manchester v. Massachusetts, that the jurisdiction of a state over the sea adjacent to its

coast is that of an independent nation. If there is a limitation of this jurisdiction, it is in the commerce clause of the constitution of the United States, under which congress may assume it; but, until congress does assume it, state legislation is valid. Steamboat Co. v. Chase, 16 Wall. 522; Sherlock v. Alling, 93 U. S. 99; The Willamette, supra.

To the jurisdiction of the state, besides the citation from Henry, supra, the appellant opposes the cases of Armstrong v. Beadle, 5 Sawy. 485, Fed. Cas. No. 541; Lord v. Steamship Co., 102 U. S. 541. If the latter case is an antagonism to Manchester v. Massachusetts, it will have to yield to the latter. But there is no antagonism. Lord v. Steamship Co. is to be interpreted as applying to the ocean beyond the three-mile limit. In Armstrong v. Beadle the facts were that plaintiff and his wife were passengers on a steamer bound from a port of Oregon to San Francisco. On the voyage she struck a rock "near" Point Arena, in the county of Mendocino, the complaint said, and plaintiff and his wife were ordered to get into a surf boat, with which the steamer was provided, and by its negligent handling his wife was thrown into the water. The answer admitted the principal facts, but alleged that while said steamship was proceeding on her voyage, and on the high seas, the said steamship was, by the perils and accidents of the seas, forced and cast upon a rock. The opinion of the court was on a demurrer to this answer. The exact locality of the disaster did not appear. The complaint put it "near" Point Arena. The answer put it "on the high seas." But there is nothing further to show whether it was inside or outside of the three-mile limit, or that the fact or the effect of such limit was urged upon the court. Nothing, therefore, can be determined from the case than that it adjudges that the statute had no extraterritorial effect. If it extends further than this, it is inconsistent with Manchester v. Massachusetts.

Against the validity of the statute may be cited Judge Hopkinson's charge to the jury in U. S. v. Kessler, Baldw. 15, Fed. Cas. No. 15,528, and for its validity the case of The Ann (decided by Judge Story), 1 Gall. 61, Fed. Cas. No. 397. The learned judge said:

"All the writers upon public law agree that every nation has exclusive jurisdiction to the distance of a cannon shot, or marine league, over the waters adjacent to its shores; and this doctrine has been recognized by the supreme court of the United States. Indeed, such waters are considered as a part of the territory of the sovereign."

The appellant further urges that it is exempt from liability by section 3 of the act of congress of February 13, 1893 (27 Stat. 445). It reads as follows:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States, shall exercise due diligence to make said vessel seaworthy, and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation, or in the management of said vessel," etc.

The acts complained of occurred in 1889, and therefore, if this statute was otherwise applicable in the circumstances of this case,— of which we express no opinion,—the statute would have to be given

a retroactive operation to make it so. It is a well-settled rule of construction that this is not done except under the compulsion of language so clear and positive as to leave no room for doubt that such was the intention of the legislature. There is no such compulsion in the language of the act relied on, and we may not so construe it.

The fourth contention of appellant—that the damages awarded are excessive—needs not much comment. It may be, as counsel urges, quoting Judge Billings in Cheatham v. Red River Line, 56 Fed. 250, that the problem of how long a man's productive life shall be estimated, and at what sum, is one of the greatest uncertainty. But an estimate must be made, and what better can we do than to take the existence and the promise of the qualities and conditions when the life was destroyed. By this test the damages awarded were not excessive. The judgment of the district court is therefore affirmed.

HANFORD, District Judge (dissenting). I concur in the opinion of the majority in holding that the place of the disaster to the Fidelity is within the boundaries of the state of California, and that the laws of California in force at the time furnish to this court a rule of decision applicable to the question in this case as to the right of widows and children to recover damages from a person or corporation guilty of negligence or a wrongful act causing the death of their husbands and fathers. I concur generally in the opinion of the majority, except that I am unable to find from the evidence that the master of the steam tug Printer or the petitioner were in any wise to blame for the disaster to the Fidelity, or by any wrongful act or negligence caused the death of the persons on board of her. The only ground upon which the petitioner or the steam tug Printer can be held liable for the damage resulting from the loss of the Fidelity is that the master of the tug was guilty of negligence or some fault which was the direct or proximate cause of the casualty, and the burden rests upon the parties claiming damages to establish by at least a fair preponderance of the evidence that there was some negligence or fault. The liability of a tug boat in general is stated by the learned judge of the district court before whom this case was tried in the following excerpt from the opinion of the supreme court in the case of The Margaret, 94 U. S. 496:

"The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the full extent of the measure of the consequences. Brown v. Clegg, 63 Pa. St. 51; The Quickstep, 9 Wall. 665; Wooden v. Austin, 51 Barb. 9; Wells v. Navigation Co., 8 N. Y. 375; The New Philadelphia, 1 Black, 62; The Cayuga, 16 Wall. 177; Cushing v. The Fraser, 21 How. 184. The port of Racine was the home port of the tug. She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning. If what occurred was inevitable, she should have forecasted it, and refused to proceed."

In seeking to fasten responsibility for damages to the tow the libelant is required to show negligence or dereliction on the part of the tug boat, affirmatively, by a fair preponderance of the evidence; and it is necessary to show with reasonable clearness the real cause of the loss.   The Webb, 14 Wall. 406; The A. R. Robinson, 57 Fed. 667.   And upon the issue of negligence or dereliction, whether as to seaworthiness, adequacy for the work, or the time of starting, the rule by which the conduct of the master of a tug boat is to be measured is this:   The law does not require a vessel, in order to be rated as seaworthy, to be capable of withstanding every peril, nor that a tug be capable of rescuing her tow in all weather, nor that she shall start only when there is no possibility of danger, nor that the master will in an emergency infallibly do that which, after the event, others may think would have been best.   The tug must be reasonably adequate for all the work undertaken, managed with reasonable judgment and nautical skill, and she must start only in weather that, in the judgment of nautical men, is reasonably safe for the trip, and the master must exercise reasonable prudence and good judgment.   A fault on the part of the tug which consists of a mere error of judgment on the part of her master is not sufficient to create a liability for resulting damage.   The Battler, 62 Fed. 612, and cases therein cited.   The customs and practice of nautical men of recognized skill, at a particular place, is a just criterion for judging as to what is reasonable prudence in a particular instance, for men whose calling requires them to contend with dangerous elements are guided in a large measure by necessity, and the particular forces which environ them.   Therefore, the rules and habits shaped by necessity may rightfully be depended upon as guides.   The Allie and Evie, 24 Fed. 745–749.

With the foregoing general rules of law in mind, the evidence must be canvassed in order to ascertain whether the facts established are such as to entitle the respondents in this case to recover, and it is proper now to take up singly the particular specifications of negligence and fault alleged against the master of the Printer.

First. It is alleged that Capt. Lawson was not licensed by the local board of pilot commissioners for Humboldt Bay, as required by the statute of the state of California.   This charge is true in fact. But Capt. Lawson was duly licensed for the service in which he was engaged, as master and pilot of the Printer, in conformity with the laws and regulations of the United States.   In such matters, the national law is paramount to the state law, and section 4444, Rev. St. U. S., prohibits the states from imposing upon pilots of steam vessels any obligation to procure a state license in addition to that issued by the United States, except in the case of persons serving as pilots of vessels other than coastwise steam vessels.   It is shown by uncontradicted evidence that Capt. Lawson had been 20 years continuously employed as pilot of steam tugs in towing over the bars at the entrances to the Columbia river, Shoal Water Bay, and Gray's Harbor; that he has been a successful pilot, and has retained the confidence of his employers; and that he had been successfully employed as master and pilot of tug boats employed in towing over the

bar at the entrance to Humboldt Bay for over three months prior to the loss of the Fidelity,—a sufficient time for him to become acquainted with the locality, the channel, the customs and usages pertaining to business in the line of his profession at the place, he being already experienced as a master and pilot on steam tugs at other places on the Pacific coast, where the dangers of his calling were similar. His lack of a state license was, therefore, not a fault, nor a contributing cause to the disaster.

Second. The next fault to receive attention is the failure of the Printer to have on board a licensed mate. The evidence shows, however, that Mr. Johnson, who was employed in that capacity, was competent, and that he performed his duties faithfully, and he did not in any manner, by omission or commission of any act, contribute towards the disaster. Such being the case, no liability attaches in favor of the respondents by reason of noncompliance with the law in this particular. The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711.

Third. The particular fault alleged is recklessness on the part of the master of the tug in attempting to cross the bar with the Fidelity in tow at the particular time, and it is contended that the state of the tide, the force of the wind then prevailing, and the tempestuous sea breaking on the bar created conditions so unfavorable for crossing, and were dangers so plainly apparent, that the conduct of Capt. Lawson in making the attempt to cross, instead of waiting outside for more favorable conditions, is inexcusable. This contention presents the main issue in the case, and upon this the findings of the district judge who tried the case are adverse to the petitioner. The rule that, where there is a conflict in the evidence, the findings of the judge before whom the case was tried on questions of fact will not be disturbed by an appellate court, cannot be fairly invoked, for the reason that the case was tried in the district court upon depositions taken out of court; and as the judge did not see the witnesses, nor have an opportunity to observe their appearance or behavior while giving their evidence, he could not be in a better position to weigh the evidence than the judges of this court; and a careful reading of the testimony in the record shows that, while the witnesses called on each side expressed opinions and stated conclusions favorable to the party calling them, there are really no contradictions as to actual facts of vital importance. To arrive at a just conclusion as to the condition of things at the time and place of the disaster, the evidence must be analyzed, and due weight given to all of it. There is no ground apparent for rejecting the statement of any witness as to any material fact in the case. The most that can be claimed is that some of the witnesses erred in their opinions and statements as to the force of the tide and of the wind, and as to the degree of roughness of the sea, and the depth of the water breaking on the bar. The only witnesses who actually saw the capsizing of the Fidelity are Capt. Lawson, Mate Johnson, of the Printer, and Capt. W. P. Smith, assistant engineer in charge of the government works in Humboldt Bay. And their statements as to the cause and manner of the casualty and the conduct of the tug can be fairly reconciled. All of the witnesses who observed the weather and sea at the

time and place of the occurrence give their individual opinions and statements as to the force of the tide, velocity of the wind, and depth of the breakers, except Capt. Smith, who gave positive testimony as to the reading of the tide gauge under his charge, showing the precise time of high tide in the morning, and the exact difference between high tide and low tide on that day, and for the days next preceding and subsequent; and Mr. Connell, observer of the weather, in charge of the United States signal station at Eureka, who shows by the record in his office the exact direction and velocity of the wind during each hour between 6 o'clock a. m. and 6 o'clock p. m. on the day in question.    The differences in the opinions and statements of other witnesses are not greater than should be expected in regard to such matters, assuming that all the witnesses were honest, and testified according to the best of their understanding, and making due allowance for such differences as would naturally arise by reason of the different standpoint and opportunity for observation of each. It is but a fair comment to say that the major part of the testimony adduced in behalf of the appellees is argumentative, rather than a plain narration of facts, and that it appears to have been elicited by leading questions.    The strongest statements are in the words of counsel, and merely assented to by the witnesses.    Giving due weight to the testimony as a whole, and to every part, and making due allowance for the interest and prejudice which some of the witnesses are shown to have, and considering the opportunity of each to observe the conditions, it is entirely safe to accept the testimony of Capt. Smith with reference to the tide.    He is disinterested, and appears to have been candid, and an intelligent observer.    His duties, for a long time prior to the occurrence, included not only the keeping of the tide gauge, but afforded ample opportunity for acquiring accurate knowledge with reference to the tide and currents exerting force on Humboldt Bar.    At the time of the casualty he was in a boat, in which he not only felt the force of the tide, but drifted with it.    There is quite as much in the testimony of the other witnesses to corroborate his statements and confirm his opinions as there is to the contrary.    He states that the self-registering tide gauge was in perfect working condition at the time, and that the total fall of the tide, between high tide, at 7:05 a. m. and low water, at 12:40 p. m., was but one foot and seven-tenths of a foot, and that the incoming flood tide on the afternoon of the same day, at high tide, was but one foot and three-tenths of a foot higher than the low-water mark at 12:40 p. m.    On the previous day, high water, at 6:30 a. m., was five feet and eight-tenths above standard low-water mark, and low water, at 11:45 a. m., was four feet and five-tenths. It was high water again at 4:30 p. m., five feet and eight-tenths; and low water at 11:20 p. m., two feet and two-tenths; and on the next day after the occurrence there was low water at 1 o'clock a. m., two feet and nine-tenths; then high water at 8 a. m., seven feet and four-tenths; then low water at 2:25 p. m., four feet and six-tenths; then high water at 7:15 p. m., six feet and three-tenths.    The Fidelity was capsized between 9 o'clock and 9:30 a. m., so that the tide had been ebbing about two hours, in which time Capt. Smith states the

water had fallen about eight-tenths of a foot. In view of these well-established facts, it is not possible that the tide could have been running with any considerable force outside of the narrowest part of the entrance to Humboldt Bay, and Capt. Lawson's statement that, at the time of starting to cross in with his tow, the state of the tide was high water slack, is literally true. It is also safe to· accept the testimony of Mr. Connell, with reference to the wind. He gives the record kept in his office for the day of the casualty as follows:

"Commencing at 6 a. m. on the 16th, from six to seven, it blew one mile of wind. The direction of the wind was from south to southwest. It varied from south to southwest. From seven to eight, two miles; eight to nine, six miles; nine to ten, eight miles; ten to eleven, thirteen miles; eleven to twelve, sixteen miles; twelve to one, eighteen miles; one to two, sixteen miles; two to three, twelve miles; three to four, fourteen miles; four to five, nine miles; five to six, fourteen miles; six to seven, fourteen miles."

These observations were taken at a distance of five miles from Humboldt Bar, and according to the testimony an allowance of one mile per hour additional velocity on the bar is reasonable, so that at the time when Capt. Lawson started to cross the bar the very light breeze prevailing during the early morning hours had increased in velocity to not exceeding nine miles per hour. This certainly cannot be characterized as a strong wind, nor portentous of immediate danger. There had not been, during the night preceding, any strong wind in the immediate vicinity; and the evidence fails to show that there was, during the morning in question, any indication of a coming storm, or any cause to anticipate high waves, or additional roughness of the sea. The Printer and another tug, the H. H. Buhne, crossed the bar, going to sea in search of vessels in the offing to be towed in. The two tugs were competitors for business, but Capt. Lawson had no occasion to take chances in order to succeed against his rival, for the other tug had preceded him in an offer of service to the Fidelity, and his offer had been rejected on the ground that the captain of the Fidelity was obliged to give preference to the Printer. The testimony shows that another tug was disabled in attempting to cross the bar on the same morning, but this circumstance is without significance, for the reason that it is not shown by the evidence that the mishap was not caused by bad seamanship or negligence on the part of her officers. The Printer met with no difficulty in crossing the bar, going out. The H. H. Buhne, which accompanied her, also crossed the bar without difficulty, and waited outside until afternoon, when she returned, after the wind had been blowing with increasing velocity for several hours, and crossed in without an accident; and her master, Capt. Hanson, who was called as a witness in behalf of the appellees, corroborates Capt. Lawson in giving as one of the rules observed by masters of steam tugs on Humboldt Bar that when the conditions are so that a tug can go out in safety to a vessel in the offing, it is safe to tow her in. His testimony on this point is as follows:

"Q. Isn't it a fact that if you can cross over the bar, and a vessel is in the offing, you can always tow her in? A. Yes, sir; I can. If I can go out with the tug boat, I can bring the vessel in, too. That is what I think every day. But if I can't get out, I can't take a vessel. If I can go with the tug boat over

the bar. I can come back again with the vessel, unless something occurs that is unlooked for, or unless something breaks down when we are out there. If everything goes well, I calculate to come right back. It is always easier to come in than to go out. You can stay outside, and watch your chance to come in, and, when a sea overtakes you, you can go in; but you can't do it in going out."

Capt. Lawson's testimony on the same point is as follows:

"It is always deemed safe to tow in when the tug can in safety cross out."

Eureka was the home port of the Fidelity, and her captain must be presumed to have been acquainted with the dangers and difficulties of crossing the Humboldt Bar, and some consideration must be given to his conduct. He had been for some time waiting in the offing for a tug, having ample opportunity to observe the conditions of the sea, wind, and tide. It is shown by the uncontradicted testimony of Capt. Hanson that he was only waiting for the Printer to tow his vessel in; and Capt. Lawson, in giving his testimony, has sworn that Capt. Christopherson expressed the opinion that the weather was favorable, and that, as it was then high tide, it was perfectly safe to tow the Fidelity into Humboldt Bay. It is certain that he consented to be towed in at that time, if he did not positively request it, for he was in no wise compelled to surrender control of his vessel to the tugboat. His responsibility is at least equal to that of the master of the tug. The mate of the Printer, Mr. Johnson, has also sworn that in his judgment, at the time of giving the hawser to the Fidelity, everything was favorable as to the time, the tide, and the condition of the bar and of the weather for crossing it in safety; that there was no reason to expect such a wave as that which capsized the Fidelity at that particular time more than at any other time, and he further expresses his opinion thus:

"I think it would be the judgment of any good boatman that the vessel should have towed in with perfect safety at the time we took her onto the bar."

In opposition to the judgment of these experienced navigators, as shown by their conduct and sworn testimony, is to be placed the evidence of the officer of the life-saving station, and his two assistants, to the effect that the bar, on the morning in question, was very rough, and that they considered it hazardous and unwise to tow a vessel in at the time when the Printer made the attempt; and the statements of Capt. Peter Bone, Capt. H. H. Buhne, and Capt. Hanson, in answer to hypothetical questions, to the effect that under conditions stated in the questions, which are not proven to have existed at the time, it would be negligence on the part of the master of a tug to tow a vessel in across Humboldt Bar; and the testimony of the cook on the Printer, to the effect that he made a voluntary suggestion to Capt. Lawson, that the bar appeared too rough to tow in, and was told by the captain to mind his own business. With respect to the men of the life-saving station, there is ample ground to assume that their opinions are founded upon the conditions existing after the casualty, rather than upon facts which they observed previous to its occurrence. Although the Printer, with the Fidelity in tow, was seen approaching the bar by one of their number, the fact made so little impression that they ceased observing the tug and her tow,

and were engaged in routine work about their establishment when the Fidelity was capsized, and they did not know of the occurrence until informed by a man sent as a messenger from Capt. Smith's boat. The expert evidence and the opinion of the cook cannot, in fairness, be allowed to outweigh the judgment of experienced and competent shipmasters and pilots. A clear preponderance of the evidence justifies and leads to the conclusion that Capt. Lawson's conduct was reasonably prudent, and was guided by what other competent and experienced nautical men, acquainted with the conditions and dangers of Humboldt Bar, would regard as good judgment.

The real cause of the disaster is shown plainly by the uncontradicted testimony of all the eyewitnesses to have been an unusually high wave or swell, which rolled in over the bar suddenly and unexpectedly, the origin of which was a disturbance at a distant point on the ocean. The Fidelity was in ballast, and she usually carried only about 20 tons, and there is no evidence tending to prove that she had a greater quantity on this occasion. With that amount of ballast, a light draught vessel of her capacity would be, as described by Capt. Lawson, "like an eggshell," in a heavy sea. The wave lifted her stern out of the water, and, instead of settling back, she careened, and the second wave coming completely capsized her. The disaster was sudden, and fully completed within a very few moments. Capt. Smith's description of the occurrence, in his testimony, is as follows:

"I saw her when she evidently took her first sea on the bar, because I could see her stern lifted. * * * I suppose she then commenced running ahead. After it lifted a while she gradually swung to the east and north, and evidently nearly stopped. The second sea threw her down to about forty-five degrees, I should think; and then I jumped up in my boat,—I jumped up on the seat,—and when I got up on top of the seat I saw her keel."

The disaster can be attributed to only one cause,—a peril of the sea,—for which no blame can be imputed to any person. It was not an inevitable consequence of crossing the bar at that particular time. The tug might have waited until the turn of the tide. If she had done so, the time would not have been more opportune, for by that time the wind had increased to about its maximum velocity for the day, and the sea was necessarily rougher than at any time during the forenoon; and if the tug had delayed for days or weeks or months she might still, in crossing the bar, have encountered a swell from the ocean, equally as dangerous.

It is my opinion that the judgment appealed from should be reversed, with costs, and the cause remanded, with instructions to enter a decree declaring the appellant to be exempt from all liability.