ALASKA PACIFIC FISHERIES et al. v. UNITED STATES. *

(Circuit Court of Appeals, Ninth Circuit. March 19, 1917.)

1. FISH ⬡⇒3—RIGHT TO FISH—RESERVATION BY PRESIDENT—AUTHORITY OF.
   Despite the power of Congress to control and dispose of the territories and other property of the United States, the President may reserve public land and adjacent waters for useful purposes without being authorized to do so by express statute. Hence Congress having by Act March 3, 1891, c. 561, § 15, 26 Stat. 1101, reserved a body of lands known as Annette Islands in Southeastern Alaska, for the use of a tribe of Indians and such other Alaskan natives as might join them, the President may, though not authorized, the islands being unfit for agriculture and the Indians not being agricultural people, reserve for the benefit of the Indians fishing rights in waters adjacent to such islands, such reservation being the practical method of carrying out the purpose of Congress, and government being a practical affair intended for practical men.
   [Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 3, 4, 6–8.]

2. FISH ⬡⇒3—PUBLIC WATERS—RESERVATION.
   The United States, as to the territory of Alaska, exercises all sovereignty, national and municipal, and hence, in view of the powers of the

king over lands flowed by the tide, United States has complete control over Alaskan waters flowed by the tide which are within its maritime jurisdiction. Consequently, the President, in view of his powers to reserve public lands, may, to carry out the purpose of an act of Congress, reserve such waters.

[Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 3, 4, 6–8.]

3. FISH ☞3—PUBLIC WATERS—RESERVATIONS.

Where Congress by Act March 3, 1891, § 15, reserved a group of islands for an Indian tribe, and such other natives of Alaska as might join them, the President's reservation of fishing rights in adjacent waters was not only for the benefit of the whole people, but was for a public purpose, being calculated to prevent the possibility of Indians becoming a public charge.

[Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 3, 4, 6–8.]

4. NAVIGABLE WATERS ☞19—AUTHORITY OF CONGRESS—POWER.

Alaskan waters within the maritime jurisdiction of the United States are under the control of Congress, and the erection in such waters without consent of Congress of a fish-trap is, in view of the government's ownership of the soil, a trespass; the structure being termed a purpresture which the government may at pleasure cause to be removed.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–63, 67–72.]

Appeal from the District Court of the United States for the First Division of the District of Alaska; Robert W. Jennings, Judge.

Suit by the United States against the Alaska Pacific Fisheries, a corporation, its officers, agents, employés, and all persons acting by, through, or under it or in privity with it. From a decree for complainant, defendants appeal. Affirmed.

C. H. Hanford, of Seattle, Wash., Hellenthal & Hellenthal, of Juneau, Alaska, and James M. Shoup, of Ketchikan, Alaska, for appellants.

James A. Smiser, U. S. Atty., and John J. Reagan, Asst. U. S. Atty., both of Juneau, Alaska, and John W. Preston, U. S. Atty., and M. A. Thomas, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge. This is an appeal from a final decree entered by the District Court of Alaska, in favor of the United States, enjoining the appellants from driving, constructing, or completing any fish-trap or structure whatsoever on and at Annette Islands reservation or in the waters appurtenant thereto or surrounding the same and being the waters within 3,000 feet from the shore at mean low tide of Annette Island, in Southeastern Alaska, and from maintaining or operating any trap or structure for fishing therein, and from fishing there in any manner whatsoever, and particularly from driving, operating, completing, or maintaining a fish-trap at or near Cedar Point, Annette Island, and from delivering or causing to be delivered any material whatsoever for the construction of fishing traps upon such reserve or in said waters. The decree further ordered that the defendant Alaska Pacific Fisheries vacate the lands and waters mentioned in the proclamation of the President of the United States of

April 28, 1916, and to remove therefrom and to remove any and all structures therefrom heretofore erected therein by it directly or indirectly, and to refrain from in any manner trespassing in and upon said waters and said reserve.

By section 15 of the Act of Congress of March 3, 1891, entitled "An act to repeal timber-culture laws, and for other purposes" (chapter 561, 26 Stat. 1095, 1101), a body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, was set apart as a reservation for the use of the Metlakahtla Indians and those people known as Metlakahtlans who had recently emigrated from British Columbia to Alaska, and such other Alaskan natives as might join them, to be held and used by them in common, under such rules and regulations and subject to such restrictions as might be prescribed from time to time by the Secretary of the Interior.

By the proclamation of the President, dated the 28th day of April, 1916 (39 Stat. pt. 2, Proclamations of the President, p. 57), it was recited that the Secretary of the Interior, with a view to assisting the Metlakahtlans to self-support, had decided to place in operation a cannery on Annette Island. It was therefore necessary that the fishing in the waters contiguous to the therein described group comprising the Annette Islands be reserved for the purpose of supplying fish and other aquatic products for said cannery. It was accordingly proclaimed by the President that the waters within 3,000 feet from the shore lines at mean low tide of Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets located within the area segregated by a broken line upon a diagram attached to and made a part of the proclamation, and also the bays of said islands, rocks, and islets, were thereby reserved for the benefit of the Metlakahtlans and such other Alaskan natives as had joined them or might join them in residence on these islands used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.

By section 10 of the Rivers and Harbors Act of March 3, 1899, c. 425, 30 Stat. 1121, 1151 (Comp. St. 1913, § 9910), it was provided that:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or *other structures* in any port, roadstead, haven, harbor, canal, navigable river, or *other water of the United States, outside established harbor lines,* or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

On the 7th day of April, 1916, the appellant Alaska Pacific Fisheries, a corporation, by its agents and employés, entered upon the navigable waters adjacent to Annette Island, less than 2,000 feet south of a

point of land designated as Cedar Point, and within 3,000 feet from the shore of the island at mean low tide, and began the erection of a fish-trap in said waters by driving a large number of piles in such navigable waters for the purpose of holding the web to be suspended between the piles; and upon the 8th day of April the appellant named had this apparatus completed for fishing, with the exception of the suspension of the web between the piles. The fish-trap so constructed and being constructed was the usual and ordinary fishing apparatus ordinarily used by those engaged in the catching of salmon in the waters of Southeastern Alaska. The portion of the trap nearest the shore of Annette Island was situate 200 feet to the seaward from the line of extreme low tide, and was within the navigable waters sur-rounding Annette Island. The entire trap is embraced within the area referred to in the President's proclamation of April 28, 1916, and, as no harbor lines have ever been established at Annette Island, the structure is in waters of the United States outside of any established harbor lines, and has been erected upon plans not submitted to or recommended by the Chief of Engineers of the United States and without any authority from the Secretary of War.

On the 2d day of May, 1916, the appellants were served with a notice, by the assistant United States attorney for the district of Alaska, that, by virtue of the proclamation, 3,000 feet of waters contiguous to Annette Island, Alaska, had been set aside for the exclusive rights of the Metlakahtlans; and the appellants were warned against trespassing on the said reserved area of waters and to cease driving or attempting to drive any traps for the purpose of catching fish within the said area and to cease fishing any traps within the said area. To this notice the attorney of the appellant corporation replied that the corporation denied that the President had lawful power to extend a reservation beyond the boundaries prescribed by an act of Congress or to include public navigable water, and suggested that, as the validity of the rights asserted would have to be adjudicated, the most expeditious manner of making an issue would be to initiate judicial proceedings. The present suit was thereupon commenced by the United States, praying for an injunction restraining the appellants from continuing the construction of the trap mentioned in the complaint, or from fishing same, or interfering in any way whatsoever with the free and uninterrupted passage of fish in and through the waters described in said proclamation, or from in any way trespassing upon the lands described in said act of Congress, or the waters adjacent thereto or upon the littoral rights of the said natives. The complaint also prayed for a mandatory injunction compelling the defendants to vacate the lands and waters and to remove therefrom and to remove said structures therefrom.

It is alleged in the complaint and admitted in the answer that the United States, by virtue of its sovereignty, is the owner and seised in fee of the body of land known as Annette Island and the waters adjacent thereto, and that prior to March 3, 1891, said island was occupied by an association of Indians known as the Metlakahtlans or Metlakahtla Indians. The date of this occupation appears to have been

in 1886, when the Indians came to the island from British Columbia under the leadership of one Father Duncan.

The complaint recited section 15 of the Act of Congress of March 3, 1891, setting aside and apart said Annette Island and islands adjacent thereto as a reservation for the use of the said Indians and such other Alaskan natives as might join them, and it is alleged that by virtue of that act the said Annette Islands, the uplands together with the shore lands, became and were at all times reserved to the exclusive use and benefit and occupancy of the Indians mentioned in the act, with the exclusive right to the use of the shore or tide lands at all places on said islands to deep water, free from obstructions erected or maintained by others; and to the right of fishing in the waters surrounding said islands exclusively; that ever since the passage of the act, the Indians mentioned in the act have been in the sole, exclusive, quiet, and peaceable possession of said islands and the waters surrounding the same and adjacent thereto; that they have improved said lands, built a town thereon known as the village of Metlakahtla, built and maintained a school, a water system, a fish cannery, and saw mill, have governed themselves and by ordinances provided for fire and health protection, and have been in the exclusive possession of the fisheries in the waters surrounding said islands, and, in addition thereto, have built and erected one of the largest churches in the territory of Alaska; that in the year 1914, by ordinance of the council of said Annette Islands, existing under the regulations of the Secretary of the Interior as provided by the act of Congress, and with the approval of said Secretary, permits were granted to natives among the class mentioned in the act of Congress, to drive and maintain fishing traps in the waters surrounding said island, and like permits were granted in the year 1915; that at no time since the passage of the act of Congress of March 3, 1891, has there been any interference by any person not mentioned in the act with the possession and rights of the persons mentioned in the act, until the interference by the appellant corporation in April, 1916, in the building of the fish-trap on the western shore and shore line of Annette Island, heretofore mentioned. The complaint sets up the President's proclamation of April 28, 1916, reserving for the benefit of the Metlakahtla Indians and such other Alaskan natives as might join them the waters surrounding Annette Island within 3,000 feet from the shore of the island, for fishing purposes, and the act of March 3, 1899, prohibiting the creation of any obstruction to the navigable capacity of any of the waters of the United States not affirmatively authorized by Congress, and making it unlawful to build or commence to build any structure in any of the waters of the United States outside established harbor lines except upon plans recommended by the Chief of Engineers and authorized by the Secretary of War. The particulars concerning the intrusion of the appellants into the waters reserved by the President's proclamation are set out in detail, together with the notices served upon the appellants, warning the appellant corporation against such intrusion.

The complaint prayed for an injunction restraining the appellants from continuing the construction of the 'fish-trap mentioned in the complaint, and from fishing same, or interfering with the free and uninterrupted passage of fish in and through the waters described in the President's proclamation, and from trespassing upon the lands described in the act of Congress or the waters adjacent thereto or upon the littoral rights of the natives. The complaint also prayed for a mandatory injunction compelling the appellants to vacate said lands and waters and to remove therefrom.

The appellants in their answer admit that, subsequent to the passage of the act of Congress referred to in the complaint, Annette Island has been occupied by the Metlakahtla Indians or the Metlakahtlans referred to in the act, but the appellants deny that the shore lines or any part of said shore lines—that is to say, the tidelands lying between low water and the ordinary line of high tide—have been reserved by virtue of said act of Congress, or have been occupied by said Indians, either in whole or in part, and the appellants deny that the right of fishing in said waters surrounding the island was by virtue of said act of Congress or otherwise reserved to the use of the said Metlakahtla Indians or others referred to in the said act or at all. The appellants deny that the said Indians, Metlakahtlans or others referred to in said act, or any other person or persons whatsoever, have had, by reason of said act or otherwise, the exclusive right to use, occupy, or control the tidelands lying between low-water mark and the line of ordinary high tide along the shore of Annette Island, or any part of said tidelands; allege that the President's proclamation was issued without authority of law and is void and of no effect. The answer sets up other matters relating to the occupation of the islands by the Metlakahtlans and the circumstances connected with its construction of the fish-trap mentioned in the complaint. Upon these matters of minor importance the reply of the United States takes issue; but the dominant question, as presented by the complaint and answer, is the right of the appellants to enter upon the waters mentioned in the complaint and erect the fish-trap at the place designated.

The errors assigned relate to the refusal of the court to make and adopt certain findings of facts as requested by the appellants, the making and adopting by the court of certain other findings of facts, the refusal of the court to adopt certain conclusions of law proposed by the appellants, and the action of the court in adopting certain other conclusions of law, resulting in the final decree in favor of the United States. The main questions at issue, as presented by the assignments of error, are stated in the following conclusions of law proposed by the appellants and refused by the court, to which refusal the appellants took exceptions:

(1) "In the construction of a fish-trap off Cedar Point, Annette Island, and the maintenance thereof the defendants were engaged in the exercise of their common right of fishery, and being so engaged in the exercise of a lawful right they acquired a vested right in said fish-trap from which they could not be divested by a subsequent proclamation of the President or otherwise without compensation."

(2) "The reservation of Annette Island, as made by act of Congress March 3, 1891, reserved the lands to ordinary high-water mark only and did not include any of the navigable waters of the United States, and that the proclamation of the President referred to in the pleadings herein was made without authority of law, in that the power to control and dispose of the territories and other property of the United States is by the Constitution vested in Congress."

[1] Referring to the last proposition first, it may be conceded, without so deciding, that the reservation of Annette Island as made by the act of Congress of March 3, 1891, reserved the lands of the island to ordinary high-water mark only and did not include the shore between the high and low water marks, nor any navigable waters surrounding the island; but it does not follow that the proclamation of the President of April 28, 1916, was made without authority. It may be conceded further that the power to control and dispose of the territories and other property of the United States is by the Constitution vested in Congress; but it does not follow that the President may not reserve public lands and adjacent waters for useful purposes without being authorized so to do by express statute.

In United States v. Midwest Oil Co., 236 U. S. 459, 471, 35 Sup. Ct. 309, 59 L. Ed. 673, the Supreme Court had before it a reservation made by the President of public lands containing petroleum or other mineral oils, chiefly valuable therefor, which prior thereto had been declared by Congress to be free and open to occupation, exploration, and purchase by citizens of the United States. The act of Congress was passed February 11, 1897 (chapter 216, 29 Stat. 526 [Comp. St. 1913, § 4635]). The President withdrew and reserved certain of these lands by an order dated September 27, 1909. The court, in sustaining the right of the President to make such reservation without statutory authority, refers to the fact that prior to 1910 at least 252 reservations for useful, though nonstatutory, purposes had been made by the President, and cites Grisar v. McDowell, 6 Wall. 364, 381, 18 L. Ed, 863, where it was said that:

"From an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses."

The court continues:

"But notwithstanding this decision and the continuity of this practice, the absence of express statutory authority was the occasion of doubt being expressed as to the power of the President to make these orders. The matter was therefore several times referred to the law officers of the government for an opinion on the subject. One of them stated ([1889] 19 Op. Atty. Gen. 370) that the validity of such orders rested on 'a long-established and long-recognized power in the President to withhold from sale or settlement, at discretion, portions of the public domain.' Another reported that 'the power of the President was recognized by Congress and that such recognition was equivalent to a grant.' 17 Op. Atty. Gen. (1881). Again, when the claim was made that the power to withdraw did not extend to mineral land, the Attorney General gave the opinion that the power 'must be regarded as extending to any lands which belong to the public domain, and capable of being exercised with respect to such lands so long as they remain unappropriated.' 17 Op. Atty. Gen. 232 (1881).

"Similar views were expressed by officers in the Land Department. Indeed, one of the strongest assertions of the existence of the power is the frequently quoted statement of Secretary Teller made in 1881: 'That the power resides in the Executive from an early period in the history of the country to make reservations has never been denied either legislatively or judicially, but on the contrary has been recognized. It constitutes in fact a part of the Land Office law, exists ex necessitati rei, is indispensable to the public weal and in that light, by different laws enacted as herein indicated, has been referred to as an existing undisputed power too well settled ever to be disputed.' 1 L. D. 338 (1881–83)."

The court says further:

"It may be argued that while these facts and rulings prove a usage they do not establish its validity. But," says the court, "*government is a practical affair intended for practical men.*"

And upon the practice of the government officers with respect to such practical affairs, the court sustained the right of the President to make such a reservation without statutory authority, citing a number of cases in support of such action.

In the present case, there is no question about the President's reservation of Annette Island being in conflict with the preceding act of Congress. It is not; but, on the contrary, the reservation is in conformity with the purpose of the act and was designed to carry that purpose into practical effect. Section 15 of the Act of March 3, 1891, reserved that island for the use of the Metlakahtla Indians and such other Alaskan natives as might join them. What use? These Indians are not agriculturalists, and, if they were, the island is practically worthless for that purpose, since the island has very little agricultural land upon it. These Indians are fishermen and hunters, and they obtain their living by fishing and hunting, mainly by fishing in waters such as surround Annette Island. The island was then reserved for the habitation of these Indians and for their use in obtaining their food supply from the waters immediately surrounding the island. Now if, as the Supreme Court says in the Midwest Oil Case, the "government is a practical affair intended for practical men," we can think of nothing more practical, under all the circumstances, than the reservation by the President of the waters immediately surrounding Annette Island for the use and benefit of these Indians; and this was undoubtedly the practical purpose Congress had in view when it made the original reservation.

[2] But did the President's authority to reserve lands belonging to the public domain give him authority to reserve the waters surrounding Annette Island "within three thousand feet from the shore at mean low tide"? Alaska is a territory of the United States. Annette Island is in that territory. The United States is therefore the owner in fee of the island and its shores; that is to say, it is the owner of the upland on the island and all the land between the high and low water marks. It is also the owner of the soil under all the navigable waters surrounding the island, and is sovereign and has dominion over all.

In Shively v. Bowlby, 152 U. S. 1, 47, 57, 14 Sup. Ct. 548, 566 569 (38 L. Ed. 331), the Supreme Court, considering the diversity

of view disclosed by the discussion as to the scope and effect of the previous decisions of the court upon the subject of public and private' rights in lands below high-water mark of navigable waters, deemed it to be a fit occasion for a full review of those decisions and the consideration of other· authorities upon the subject. The court then proceeds to review the leading decisions and authorities and reaches' certain conclusions; among others, that, notwithstanding the dicta contained in some of the opinions of the court to the effect that Congress had no power to grant any land below high-water mark of navigable waters in a territory of the United States, it was not strictly true, and, after a review of the authorities, concludes that:

"By the Constitution, as is now well settled, the United States, having rightfully acquired the territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, federal and state, over all the territories, so long as they remain in a territorial condition. (Citing cases.)

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory."

Then, as a final summary of its conclusions, the court says:

"Lands under tidewaters are incapable of cultivation or improvement in the manner of lands above high-water mark.· They are of great value to the public for the purposes of commerce, navigation, and *fishery.* Their improvement by individuals, when permitted, is incidental or subordinate to the public use and right. Therefore the title and the control of them are vested in the sovereign for the benefit of the whole people.

"At common law, the title and the dominion in lands flowed by the tide were in the king for the benefit of the nation. Upon the settlement of the colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the Constitution to the United States.

"Upon the acquisition of a territory by the United States, whether by cession from one of the states, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several states to be ultimately created out of the territory. * * *

"The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, *may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tidewaters.* But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union."

These conclusions were reached by the court in determining conflicting rights of private parties to certain shore lands fronting on the Columbia river at the city of Astoria; one party deriving title from a donation claim acquired under an act of Congress while Oregon was a

territory, and the other party claiming under a subsequent grant from the state of Oregon, pursuant to its statutes as a state.

In the present case, we are not dealing with the rights of grantees under conflicting grants, but with the scope and purpose of a reservation by the United States. It may be said therefore that the law declared in this case is dictum as applied to the question involved in the present case; but the court, in reaching the conclusions it did, found it necessary to review the whole question of public and private rights in the lands under the navigable waters of the United States and cites authorities in support of all of its conclusions. The statement of the law by the court is therefore controlling, and we must hold that the reservation of Annette Island by the act of Congress, and of its surrounding waters by the President's proclamation, is fully sustained.

[3] It may be objected further that the law as stated by the Supreme Court is not authority for the reservation of the waters adjacent to Annette Island for the reason that the reservation is for the benefit of the Metlakahtla Indians and not for the whole people. We think that such a reservation is for the benefit of the whole people. It protects the food supply of a whole tribe of Indians and other native Indians that may join them and provides the means for their self-support. In guarding against the possibility of these Indians becoming a public charge, the measure is clearly a public concern and for the benefit of the whole people.

[4] But, as we are not limited in our conclusions to the issues thus presented, we return to the original question, namely, have the appellants the right to enter upon the waters mentioned in the complaint and erect a fish-trap at the place designated? The Metlakahtla Indians are not parties to this action, and their rights under the reservation are not involved in this controversy. The appellants have no title to the soil under the waters where they have driven the piles for the fish-trap which is the subject of this complaint, nor have the plans for the structure been approved by the Chief of Engineers, nor the structure itself authorized by the Secretary of War. The United States, the complainant in this case, is the owner of the soil. The appellants, as defendants, are mere trespassers.

The law applicable to such a case was stated by the Supreme Court in Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798. In that case the state of California had reserved certain lands in the navigable waters of the Bay of San Francisco for the construction of wharves. The lands were situated nearly half a mile from what was the shore of the Bay of San Francisco at the time California was admitted into the Union, and over which the water at the lowest tide then flowed at a depth sufficient to float vessels of ordinary size. Weber had a wharf erected in these waters which he claimed to own under a title derived from the city of San Francisco and by possession and prescription covering a period of 13 years. The court, referring to the proposition that in several of the states, by general legislation or immemorial usage, the proprietor whose land is bounded by the shore of the sea, or of an arm of the sea, possesses the right to erect a wharf or pier in

front of his land, extending into the waters to the point where they are navigable, said:

"In the absence of such legislation or usage, however, the common-law rule would govern the rights of the proprietor, at least in those states where the common-law obtains. By that law the title to the shore of the sea, and of the arms of the sea, and in the soils under tidewaters, is, in England, in the king, and, in this country, in the state. Any erection thereon without license is therefore deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a *purpresture*, which he may remove at pleasure, whether it tend to obstruct navigation or otherwise."

On the southeast coast of Massachusetts is a body of water called Buzzard's Bay, an inlet of the Atlantic Ocean. It is about 30 miles in length and 5 to 10 miles in width. Over the waters of this bay the commonwealth of Massachusetts has assumed the jurisdiction which the United States has over the waters of Alaska, and has by statute made certain reservations and regulations governing the fishing industry carried on in the waters of the bay. Among other regulations, it has provided against the use of the purse seine in taking fish anywhere in the waters of the bay. In Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159, the Supreme Court of the United States had before it the question whether these regulations would prevail to exclude the defendant from taking fish in Buzzard's Bay by using a purse seine. The defendant was a citizen of Rhode Island and was engaged in fishing for menhaden with a steamer under a license issued by the United States. In the act of fishing, the defendant used no fixed apparatus, and the bottom of the sea was not encroached upon or disturbed. This latter fact was considered an important feature of the defense, and in this particular that case is distinguished from the present one and was a much stronger case for the defendant. Another defense was that the act complained of was committed upon the high seas, the common property of the people, and it was contended there, as it is here, that proprietary rights could not be reserved in such waters; that the characteristic feature of the proprietary title in the seashore was its limitation to low-water mark. The Supreme Judicial Court of Massachusetts held the statute of Massachusetts under which the defendant was being prosecuted constitutional and valid. Commonwealth v. Manchester, 152 Mass. 230, 25 N. E. 113, 9 L. R. A. 236, 23 Am. St. Rep. 820. The Supreme Court of the United States upon writ of error affirmed the judgment of the Massachusetts court, and, in doing so, it said:

"We think it must be regarded as established that, as between nations, the minimum limit of the territorial jurisdiction of a nation over tidewaters is a marine league from its coast; that bays wholly within its territory not exceeding two marine leagues in width at the mouth are within this limit; and that included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or free-moving fish, or fish attached to or embedded in the soil. The open sea within this limit is, of course, subject to the common right of navigation; and all governments, for the purpose of self-protection in time of war, or for the prevention of frauds on its revenue, exercise an authority beyond this limit. Gould on Waters, pt. 1, c. 1, §§ 1–17, and notes; Neill v. Duke of Devonshire, 8 App. Cas. 135; Gammell v. Commissioners, 3 Macq. 419; Mowat v. McFee, 5 Sup. Ct. of Canada, 66; The Queen v. Cubitt, 22 Q. B. D. 622; St. 46 & 47 Vict. c. 22."

In concluding the opinion, the court said:

"We do not consider the question whether or not Congress would have the right to control the menhaden fisheries which the statute of Massachusetts assumes to control; but we mean to say only that, as the right of control exists in the state in the absence of the affirmative action of Congress taking such control, the fact that Congress has never assumed the control of such fisheries is persuasive evidence that the right to control them still remains in the state."

The jurisdiction exercised by the commonwealth of Massachusetts over the waters of Buzzard's Bay is the jurisdiction which the United States has over the waters of Alaska; and, under the law as declared in the case just cited and in Weber v. Harbor Commissioners, supra, the appellants have acquired no rights, vested or otherwise, to construct or maintain a fish-trap within the waters reserved by the President's proclamation.

The judgment of the District Court is affirmed.